**YOSEMITE TENANTS ASSOCIATION; Jay Johnson, individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**William B. CLARK, Secretary of the Interior;[1] Russell E. Dickenson, Director of the National Park Service; Robert Binnewies, Superintendent of Yosemite National Park, Defendants.**

**No. CV F 83–357–EDP.**

United States District Court, E.D. California.

March 22, 1984.

---

units", *and other intensive care type inpatient hospital units .... "* (emphasis added).

**1.** William B. Clark is now the Secretary of the Interior and is substituted in place of James G. Watt. [*See* Fed.R.Civ.P. 25(d)]

Jed Scully, Scully & Scully, Sacramento, Cal., for plaintiffs.

Donald Ayer, U.S. Atty., Louis Demas, Asst. U.S. Atty., Sacramento, Cal., for defendants.

## MEMORANDUM DECISION RE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION.

PRICE, District Judge.

The plaintiffs, an unincorporated association, and Jay Johnson, an individual acting in his own behalf and on behalf of persons similarly situated, seek to enjoin, pending the resolution of this matter on its merits, certain rental increases that have been assessed the residents of Yosemite National Park occupying living quarters owned and furnished by the United States government. The plaintiffs' motion involves complex issues of law, and the Court has been hampered by a paucity of evidence that has been introduced by the parties that is material to the central legal issues underlying this dispute.[2]

I

### *Statutory Background*

In 1966, as part of the codification of the general and permanent laws relating to the organization of the government of the United States and its civilian officers and employees, the Congress passed 5 U.S.C. § 5911, which reads as follows:

(a) For the purpose of this section—

(1) "Government" means the Government of the United States;

(2) "agency" means an Executive agency, but does not include the Tennessee Valley Authority;

(3) "employee" means an employee of an agency;

(4) "United States" means the several States, the District of Columbia, and the territories and possession of the United States including the Commonwealth of Puerto Rico;

(5) "quarters" means quarters owned or leased by the Government; and

(6) "facilities" means household furniture and equipment, garage space, utilities, subsistence, and laundry service.

. . . . .

(c) Rental rates for quarters provided for an employee under subsection (b) of this section or occupied on a rental basis by an employee or member of a uniformed service under any other provision of statute, and charges for facilities made available and in connection with the occupancy of the quarters, shall be based on the reasonable value of the quarters and facilities to the employee or member concerned, *in the circumstances under which the quarters and facilities are provided,* occupied, or made available. The amounts and the rates and charges shall be paid by, or deducted from the pay of, the employee or member of a uniformed service, or otherwise charged against him in accordance with law. The amounts of payroll deductions for the rates and charges shall remain in the applicable appropriation or fund. When payment of the rates and charges is made by other than payroll deductions, the amounts of payment shall be credited to the Government as provided by law. (d) When, as an incidental service in support of a program of the Government, quarters and facilities are provided by appropriate authority of the Government to an individual other than an employee or member of a uniformed service, the rates and charges therefor shall be deter-

---

**2.** Much of plaintiffs' efforts are concentrated on the economic impact on the individuals affected; the government failed to introduce any evidence to justify the administrative decisions which are central to this dispute.

mined in accordance with this section. The amounts of payment of the rates and charges shall be credited to the Government as provided by law.

(e) The head of an agency may not require an employee or member of a uniformed service to occupy quarters on a rental basis, unless the agency head determines that necessary service cannot be rendered, or that property of the Government cannot adequately be protected, otherwise.

(f) The President may prescribe regulations governing the provision, occupancy, and availability of quarters and facilities, the determination of rates and charges therefor, and other related matters, necessary and appropriate to carry out this section. The head of each agency may prescribe regulations, not inconsistent with the regulations of the President, necessary and appropriate to carry out the functions of the agency head under this section. (emphasis added)

Congress did not, at any time, file any committee reports or indicate a purpose other than state that Public Law 89–544, § 1 was a part of the general effort to bring together into a single code all of the permanent laws relating to the organization of the government of the United States and pertaining to its civilian officers and employees. Significantly, this section has not been construed by any appellate court of the United States in a reported decision.

By Executive Order No. 11609 of July 22, 1971, the authority of the President under subsection (f) to issue the regulations provided for therein was delegated to the Director of the Office of Management and Budget (hereinafter OMB).

## II

### The Regulatory Scheme And Its Prior Implementation in Yosemite

The OMB designated Circular No. A–45, as revised, as the appropriate document setting forth the policies governing charges for rental quarters and related facilities. In 1973, the Department of the Interior adopted regulations governing the establishment of quarters rental rates. Generally, these regulations flesh out declarations of policy as contained in OMB Circular No. A–45, revised.

Appendix 1, OMB Circular A–45, provides as follows:

2. *Frequency of Adjustment.* Charges for rental quarters shall be adjusted periodically in accordance with the following:

(a) *Periodic (Cycle Year) Adjustments Based on Survey of the Private Rental Market.* Basic rental rates established for rental quarters shall be affirmed or adjusted by survey of the private rental market, as follows: (1) Every fifth year, or when the basic rental rate for quarters has been increased by 10% through application of the rent series of the U.S. city average (national average CPI), whichever occurs first, *provided* that valid and realistic comparability has been established with private rental rates, or (2) every third year if for any valid reason and realistic comparability with private rental rates has not been established, or (3) any year when changes in the private rental market in the nearby established community indicate a need to adjust basic rental rates on the basis of a survey of the rental market.

OMB Circular A–45 also provides that when the government furnished quarters (GFQ) were located more than five miles from an established community,[3] basic

---

**3.** Established community is defined as follows: *Established communities.* For the purposes of calculating a deduction under paragraph 6c(1) of this Circular, an established community is a population center offering the minimal community services listed below on a year-round basis, or, alternatively, on approximately the same seasonal basis as the occupancy of the Federal rental quarters under consideration. Conformity with this definition, without regard to popula-

tion size or other criteria, is the sole basis for identification of an established community.

| Services | Minimum |
|---|---|
| Medical | 1 physician, 1 dentist |
| Educational | Public elementary and high school (unless transportation is provided without charge to a county or district school). |

rental rates will be set by one of two alternate methods:

(1) *Comparability with the nearby representative private community.* Rental rates in and adjacent to the nearby representative private community [4] may be used as a base for establishing comparable rentals.

(2) *Regional basis.* Basic rental rates may be set in comparison with the average of rental rates for comparable private housing in an economically homogeneous area in which the rental quarters are located. The area selected should be large enough to permit an adequate sampling of comparable quarters (it may contain several communities), but small enough to maintain economic homogeneity and the area must be permanently defined. Extremely high and extremely low private housing rents should be excluded in computing the average in each classification of housing.

The Court finds that Mariposa, California, qualifies as an established community as well as a nearby representative private community.

Little evidence was offered as to the historical administrative enforcements of these statutes although some insight is provided by the declaration of George W. Sandberg, Chief of the Division of Real Property Management:

| Services | Minimum |
| --- | --- |
|  | Public library, school library available to the public, or scheduled mobile library. |
| Shopping ........... | Grocery, drugs, clothing, hardware, and general household needs. |
| Religious ............ | Congregations of two faiths or denominations. |
| Public transportation ... | Connection with at least one major town or city by common carrier. |
| Minimal social, cultural or entertainment facilities |  |

**4.** OMB Circular No. A–45 defines "nearby representative private community" as follows: "For purposes of establishing comparability, a nearby representative private community is the nearest community to the rental quarters offering a rental housing market, together with the

In my judgment, the major concern of the tenants quartered in Yosemite housing relative to the large rental increases they have experienced is due to the fact the previous rental rate increases were not increased in a timely fashion. Due to a decision of the former Secretary of Interior, Cecil Andrus, a moratorium on rental increase has existed since February 10, 1981. Prior to that date, from December 13, 1978 to February of 1981, a limitation was imposed consisting of a maximum annual increase of seven (7) percent. As a result of these combined actions, the Yosemite rental rates have been allowed to fall behind the active rental market in Mariposa and other California areas during a period of inflation and rapidly escalating rental rates. Once the regional survey rates are fully implemented, and future annual Consumer Price Index adjustments are utilized, future rental surveys should result in a minimum increase in rental rates.

Elsewhere, the administrative record discloses that GFQ's had previously been subjected to rental adjustments based upon the "nearby representative community" alternative contained in OMB Circular No. 45–B. The details of these previous adjustment processes were not detailed, but there was a suggestion that the community of Mariposa figured largely in the establishment of comparable rental rates for the GFQ's at Yosemite.

minimal services set forth in the preceding paragraph. It must be a community which is not unreasonably affected by conditions of seasonal agriculture or tourism, population explosion, severe economic depression, or other such conditions which may have created an inequitable rent structure in that community not shared by the general region in which the rental quarters are located. 'Representative' is intended to recognize that comparability in housing includes such things as the economic environment of the housing. Thus, for example, housing in a small Government reservation should not be directly compared with housing located adjacent to undesirable areas in a large city. It is intended that comparable housing be selected as nearly as possible to establish a rental rate that

### III

*The Methodology Employed by the Secretary To Arrive at the Rental for the GFQ in Yosemite*

#### A. The Regional Survey

In January of 1982, a memorandum from the Secretary's office directed all units of the Department of the Interior to proceed to implement the Congressional directive with regard to rents. Previously in California, rental increases had been determined by using individual appraisal, relying upon the use of a very small number of comparable units.

A determination was made by the appropriate officials of the Department to use the regional survey alternative authorized by OMB Circular No. A–45 revised.

The administrative justification for the regional survey is as follows:

This survey was undertaken in accordance with the Office of Management and Budget Circular No. A–45, as revised, guidelines as supplimented [sic] by Departmental regulations and procedures. OMB guidelines provide for reconfirmation of the market based rental rates once every five years, or sooner, if conditions warrant. It marked the first time a regional quarter rental survey had been conducted in California by the Department of the Interior. Previously the respective bureaus within the Department each conducted separate rental appraisals. As a result, the bureaus and the U.S. Forest Service each had a different anniversary date for their housing surveys. In the future, a single date, that of November 1981, will be used as the survey anniversary date. The next regional survey in California will, therefore, be scheduled for the spring of 1986 with the rental rate effective on or about November 1, 1986.

The collection and analysis of rental housing data was accomplished in a manner similar to the recently completed Colorado—Utah survey. Automated analytical procedures were used to establish basic rental rates for Housing Classes (A–H, K, M, N and Y). Rental rates for the remaining Housing Classes (I and W) were established using the Modified Principle of Comparability (refer to Interior Property Management Regulation (IPMR 114–52.107)).

The objective of regional surveys as set forth in OMB Circular No. A–45, as revised, is to develop reasonable rental rates based upon the "... average of rental rates for comparable private rental housing in an economically homogeneous area in which the rental quarters are located..."

The use of regression analysis techniques allows the analyst to establish a basic rental rate for a given type of quarters that reflects the average rate for the type of housing in the survey area. In addition, regression analysis allows the establishment of adjustments that reflect: (1) the contributory value ( + ) of housing features that the private rental market indicates re significant, and (2) identification and special treatment of relevant social and economic factors. In particular, the impact of major recreational uses (ski areas) or mining and mineral operations can be assessed and adjusted for.

*Regression analysis permits assessment of and adjustment for the impact of social and economic forces, as measured by market rents. Therefore, it is no longer necessary to establish tight, economically homogeneous area boundaries for survey purposes.*

Thus, the boundaries established for regional surveys can be drawn more for administrative convenience than would be possible if the regional survey data were to be analyzed manually. More than one state can be surveyed at a time to minimize data collection costs, with the rates individualized, where appropriate, by state, or portion thereof, including individual communities. (emphasis added)

In preparation for this, each agency of the Department of the Interior was re-

truly represents the 'reasonable value' of the quarters to the occupant."

quested to submit the names of communities they had previously used in establishing their "comparables" for prior rental adjustments. According to Mr. Sandberg, a list of over 200 proposed comparable communities was compiled. From this list, the following communities were selected for the survey.

| Community | 1980 Population | Contractor's Comments Regarding Community Characteristics |
|---|---|---|
| Alturas, California | 3,020 | Predominately a farming town, Alturas has very few rentals and a very stable population. |
| Bishop, California | 3,333 | The largest force in the local real estate market is the large public ownership of land in Inyo County, approximately 98% of all land in the county. The net result is a static supply of housing with an increasing demand which has served to increase rents. Bishop is 30 miles south of Mammoth Mountain, one of the largest ski areas in the country. |
| Crescent City, California | 3,099 | Crescent City, the county seat of Del Norte County, is dominated by fishing and tourism industries. These seasonal activities have a big impact on the local economy, including the rental market. There are many rental samples and a fairly high turnover rate in these rentals. |
| Jackson, California | 2,331 | Jackson is the county seat of Amador County in the foothills of the Sierra Nevada, it rose to prominence as a gold mining town in the center of the "Mother Lode," however, since WWII, mining has all but ceased and Jackson now survives as a recreation, retirement and tourist center about 125 miles from San Francisco. Rents are fairly low, reflecting the relative lack of pressure on accommodations and older condition of most rental properties. |
| Nevada City, California | 2,431 | Founded in 1849, it was a mining center in the "Mother Lode." Nevada City has survived by becoming a well preserved tourist attraction and service center for sparsely populated Nevada County. It has also attracted its share of city drop-outs who prefer a more sedate existence. Nevada City supports a newspaper, a radio station (in Grass Valley), a hospital, three banks, and four schools. Due to the recent influx of "city types" rents have tended to rise in recent years. |
| Portola, California | 1,885 | Portola has a marginal economy and it is unclear on what the economy is based. There is a small amount of farming evident. According to the local realtors, the population has not increased in recent years. Rental housing is in very short supply but this is no factor for there is very little demand. |
| Weed, California | 2,879 | Located at the foot of Mount Shasta, Weed is a tourist mecca with a large logging and plywood factory (depressed) and a college. A fair amount of rental properties. |
| Exeter, California | 5,619 | Exeter is located in the Central Valley of California and is a strong agricultural center. |

| Community | 1980 Population | Contractor's Comments Regarding Community Characteristics |
|---|---|---|
| | | The per capita income is relatively low; the town has deep ethnic divisions and many transient workers. The rents seem depressed because of the inability of the workers to pay higher rates for housing. |
| King City, California | 5,495 | King City is located in a prosperous agricultural area and has not grown as rapidly as other nearby cities. King City is clean and attractive, and has no visible social and economic problems. Agriculture is the main industry. |
| Placerville, California | 6,739 | Placerville, formerly known as Hang Town, was established in 1849 as the hub of the gold rush and was at one time the third largest town in California. Nowadays, the town is the service center for 35,000 people and straddles the main route from Sacramento to Lake Tahoe and Reno, Nevada, making it a busy trade and tourist oriented town. Supply and demand are in balance, keeping rents stable. |
| Susanville, California | 6,520 | Good population size, positively influenced by a college, logging and state penitentiary. Large amount of rental property. |
| Taft, California | 5,316 | The petroleum industry controls the direction of the City of Taft. All outlying areas are leased or owned by the petroleum industry, making growth a function of the oil companies' benevolence. To date they have not been terribly benevolent, thus retarding probable growth. The housing supply is stable, with demand at a very high level. Some employees commute from Bakersfield, 35 miles east. |
| Willets, California | 4,008 | Willets is a rural community with light industry and tourism. Nestled in the redwoods, Willets capitalizes on its natural charm to attract newcomers. The town seems fairly sufficient. |
| Willows, California | 4,777 | Willows is a good town for rental survey work because the forces of supply/demand are uninhibited by any unusual population characteristics. Agriculture is the largest employer and base industry, with manufacturing being the other base industry. Rising unemployment is beginning to impact the town. |
| Yreka, California | 5,916 | A perfect population base for the rental survey with a respectable amount of rental properties. This history laden town has lots of restored Victorian houses and an active tourist industry. |
| Auburn, California | 7,540 | Auburn sits at the junction of Highway 49 and Interstate 80 about 30 miles east of Sacramento. It is the county seat of Placer County, and as such was a mid-nineteenth century mining center. It has now succumbed to urban sprawl and is spread out over a large |

| Community | 1980 Population | Contractor's Comments Regarding Community Characteristics |
|---|---|---|
| | | area making it very much an automobile oriented town. It is well situated in relation to the California population centers to the west and the mountains to the east. Rents are fairly high, reflecting Auburn's proximity to major population centers. |
| Banning, California | 14,020 | Banning serves as a small bedroom community located approximately 30 miles east of the Riverside-San Bernardino metropolitan area. Again, the majority of mobile home parks do not allow rentals because of the demand for mobile home spaces and the difficulty of controlling tenant-occupied units. |
| Fortuna, California | 7,591 | Fortuna's economy is largely influenced by logging and fishing. The town appears to be well run indicating an adequate tax base and efficient administration. Unemployment is not evident. No unusual or abnormal influences appear to impact the town. |
| Mariposa, California | 8,638 | The Mariposa survey sheets were found lying loose in the administrative record, and did not contain the usual descriptive material concerning the community. However, Beverly Barrick, a member of the Board of Supervisors of Mariposa County indicates because of the shortage of top soil in Mariposa, that the highest single family population density is one unit per 5 acres, going up to as high as one unit per 160 acres. A six-unit apartment under present zoning would have to occupy a 30 acre site. The majority of the income of its population is realized from tourist related industries. Mariposa is one of the poorest counties in the state. Mariposa County has doubled its population within the last 15 years; most of the increase taking place within the last 6 years. Most of this increase has been accomplished by people purchasing or building individual housing units rather than the occupancy of rental units. Mariposa is the "nearby representative community" that was used for administrative adjustments and comparisons in fixing the adjusted rental rates on the GFQ at Yosemite. |
| Pinedale, California | 9,490 | Pinedale was never incorporated as a township until its annexation into Fresno 2.5 years ago. Some housing units date back to its beginning as a lumber camp prior to WWII, and to its use as a camp for the Signal Corps and as a Japanese-American detention camp. After the War, some housing units remained. Predominately older, smaller, below average housing in the area attributed to consequent influx of lower income families. Very little commercial development exists in Pinedale, though it is serviced by a Post Office (less than 1,200 residential deliveries) and an elementary school, and has a large cotton mill |

| Community | 1980 Population | Contractor's Comments Regarding Community Characteristics |
|---|---|---|
| | | type facility on its western boundary. Due to its uniqueness, Pinedale remains a separate community as public attitude, despite its incorporation into Fresno. Addresses are classified, and telephone book listings note Pinedale as a location; it is serviced by the Pinedale County District Water/Sewer facility; its psychological boundaries coincide with its census tract boundaries; and it is virtually isolated from Fresno proper by several miles of unincorporated residential and commercial developed properties. The primary motivation for incorporation was to upgrade the area. A majority of properties appears to be rentals. Vacancy rates are surprisingly low with agent/landlords indicating short turnover times. Several were using vacant periods to accomplish items of deferred maintenance. |
| Red Bluff, California | 12,358 | Surrounded by mountains, Red Bluff has a well-balanced economic base. Recreation plays a large part in economy, but no single industry predominates. Mobile home parks do not allow rentals. |
| Sanger, California | 12,000 | Located in the San Joaquin Valley, Sanger's economy is heavily influenced by agriculture. There are well defined socio-economic classes, and in general, the "workers" are transient by nature and earn relatively low wages. The rents sometimes vary with the season, and seem generally depressed. |
| Chico, California | 26,601 | Chico has a large population base (approximately 140,000) and appears to be the economic center of Northern California with services and education being the largest employers. The base industries are agriculture, wood processing and manufacturing/assembly. The economic climate appears balanced. Chico State influences rents in the immediate area of the campus, but has no effective impact on the housing market due to the size of the town. |
| Eureka, California | 24,153 | Eureka, the county seat of Humboldt County, is also its largest town. Logging and tourism are the largest industries in the area, although there is some farming and fishing. There are many rentals available in this thriving community. |
| Hemet, California | 23,211 | Hemet is basically a retirement community, and there is a higher than average concentration of mobile homes within the city. Recently, some industry has been attracted to the area, but until now there has been little demand family apartment housing. No three bedroom apartments were found that met the age requirements of the survey. |
| La Canada, California | 20,153 | La Canada is an affluent surburban community. The exclusive nature of the homes, the climate |

| Community | 1980 Population | Contractor's Comments Regarding Community Characteristics |
|---|---|---|
| | | and lush vegetation, as well as the excellent public school system, place housing in La Canada at a premium. There are no mobile homes within 5 miles of La Canada. La Canada has very few apartments, however, surrounding communities including La Crescenta, Montrose, Glendale, etc. offer lower cost housing. |
| Madera, California | 21,732 | Madera is located on Highway 99, one of the two major north/south arterials in California, and is further located on the border of Fresno County (producer of more produce products in 1980 than any other U. S. county) and in the center of the San Joaquin Valley, a major agricultural area in this country. Madera is approximately 22 miles from Fresno and many residents commute there to employment. It was found to be a healthy and essentially growing community. |
| Ridgecrest, California | 15,929 | Ridgecrest's largest base economic factor is the China Lake Naval Weapons Center, a division of the United States Navy. It appears, however, the impact of the base is reduced as two-thirds of the base employees are civilians, and not as transient as typical military personnel. |
| Clovis, California | 33,021 | As described by one local realtor, Clovis was a "sleepy" little town of virtually no growth for about 40 years. The "boom" in the Fresno metropolitan area which began in the early 1970's resulted in developer speculation in areas just outside Fresno where land was less expensive. The primary areas affected were those north and east of Fresno. Clovis is situated northeast of Fresno and the land along Clovis' western city limits began to develop with commercial uses, high density residential uses, and mobile home parks. This is, in part, felt to be due to the location of CSU-Fresno, some .5 to 1 mile west of Clovis' westerly city limit boundary. The result today is older commercial and residential units surrounding the "downtown" area of "old" Clovis, and newer commercial and residential uses on the western side of Clovis. The northeastern Fresno city limits and western Clovis city limits are contiguous, and end except along those boulevards where signs mark the transition. Although many large apartment complexes now exist in the Clovis area, most that include three bedroom and/or efficiency units are younger than the minimum age parameters required by the State of California. Therefore, no three bedroom apartment samples were gathered, and the efficiency units were found in old hotel/motel buildings or were efficiency duplex units. |
| Fontana, California | 37,109 | Fontana is a suburb of San Bernardino serving as a "bedroom" community. Some industry within the area has been curtailed, causing higher |

| Community | 1980 Population | Contractor's Comments Regarding Community Characteristics |
|---|---|---|
| | | vacancy rates. The majority of mobile home parks do not allow rentals due to the demand for mobile home spaces and the difficulty of controlling tenant occupied units. |
| Glendora, California | 38,654 | Glendora serves as a "bedroom" community in the Los Angeles Metropolitan Area. Because of the scarcity of housing, homes are high priced and vacancy rates are low. The majority of mobile home parks do not allow rentals because of the high demand for mobile home spaces and the difficulty of controlling tenant occupied units. |
| Petaluma, California | 33,834 | Petaluma is located some 45 minutes from the Bay Area, and some 45 minutes from the Point Reyes Coastal Reserve/Park. Surrounded by agricultural uses, predominately dairy farming, it was found to be a healthy and thriving town. The residential areas immediately surrounding the "downtown" area are built up with many older homes, some of the Victorian vintage, which have been converted into apartment units in the restoration process. The rental market here is a very strong one and conversations with rental service agents indicate that their list of potential tenants seeking rental units continues to outnumber the units available to rent. One efficiency unit collected in this survey had been advertised for rent for two days and the landlord had to quit taking applications for consideration. |
| Redding, California | 41,995 | Redding is the recreational center of Northern California, surrounded by lakes, mountains and rivers. Located at the northern end of the San Joaquin Valley, Redding is also the retail and industrial center for the immediate vicinity. |
| San Luis Obispo, California | 34,252 | San Luis Obispo has a well-rounded economy that is supplemented by the local university, Cal Poly-San Luis Obispo, which has approximately 20,000 students. The university impacts housing within walking distance from the university, but, otherwise has no abnormal economic impact. |
| Bakersfield, California | 105,611 | Bakersfield is a reasonably large metropolitan area with the major employer being the petroleum economic forces impacting the area. |
| El Cajon, California | 73,892 | El Cajon is a suburb of San Diego, serving as a "bedroom" community. The San Diego area is one of the fastest growing metropolitan areas in the country. Because of the scarcity of housing, homes are high priced, and vacancy rates are low. The majority of mobile home parks do not allow rentals because of the high demand for mobile home spaces and the difficulty of controlling tenant occupied units. |
| Escondido, California | 62,480 | Escondido is located approximately 30 miles northeast of San Diego and has recently experienced rapid growth, largely influenced by the |

| Community | 1980 Population | Contractor's Comments Regarding Community Characteristics |
|---|---|---|
| | | San Diego metropolitan area. Availability of housing, again, is scarce, causing high priced homes and low vacancy rates. The majority of mobile home parks do not allow rentals because of the high demand for mobile home spaces and the difficulty of controlling tenant occupied units. |
| Orange, California | 91,788 | Orange is a suburb of Los Angeles. The Los Angeles area is one of the fastest growing metropolitan areas in the country. Because of the scarcity of housing, homes are high priced, and vacancy rates are low. The majority of mobile home parks do not allow rentals because of the high demand for mobile home spaces and the difficulty of controlling tenant occupied units. |
| San Bernardino, California | 118,057 | San Bernardino and Riverside are the base of a large metropolitan area east of Los Angeles. Some industry within the area has been curtailed causing higher vacancy rates. Again, the majority of mobile home parks do not allow rentals due to the demand for mobile home spaces and the difficulty of controlling tenant occupied units. |
| Santa Barbara, California | 74,542 | Santa Barbara is a rapidly growing metropolitan area located north of Los Angeles. Because of the scarcity of housing, homes are high priced and vacancy rates are low. The majority of mobile home parks do not allow rentals because of the high demand for mobile home spaces and the difficulty of controlling tenant occupied units. |

The contractor was instructed to omit certain classifications of housing from his survey:

First, if any community was found not to have a representative sample of any one of the classes of homes designated to be surveyed, that class would be omitted from the survey of any particular community.

Second, certain types of housing, *i.e.*, lookouts, bunkhouses, tents, etc., were omitted entirely, on the logical grounds that such units are not customarily used outside of federally owned property.

Third, the contractor was instructed to exclude housing where the renter furnished some service, *e.g.*, maintenance, repair, custodial service, etc.

The contractor was mandated to obtain four (4)—no more, no less—samples of each of the eleven (11) classes of housing being surveyed. The contractor was further mandated to obtain no less than fifteen (15) samples in a single community.

The survey form to be used was prescribed. The contract contemplated that approximately 1100 housing units would be surveyed, but there was no direction as to how they would be distributed among the surveyed communities.

B. *The Yosemite Inventory of GFQ's*

The administrative record indicates that this survey was to be initiated by a physical inventory of GFQ's conducted by each of the Department units. Accuracy in this phase of the operation, of course, was critical to the accuracy of the end product.

The plaintiffs introduced evidence from which the Court concludes that the administration at Yosemite National Park has not been following the mandates of the

Government Furnished Quarters Guideline (NPS–36) with reference to inspection of the GFQ's in Yosemite National Park. In pertinent part, NPS–36 requires the Park Superintendent to implement a formalized procedure for the *annual inspection* of quarters. Further, the Superintendent is required to maintain and continually update quarters records necessary to provide an accurate quarters inventory that is a basic factor needed for the comparability surveys and regional surveys. The evidence is uncontradicted that the last time a physical inspection of all of the GFQ's in Yosemite occurred was in 1976. None was made in preparation for this round of rental increases.

In order to rectify this deficiency, in anticipation of rent adjustments, that inspection frequently was only one unit per class of house rather than individual quarters. Using their historical "base" information, the Yosemite GFQ inventory was completed from a variety of sources, such as repair and replacement records, the familiarity of the officer-in-charge of the Housing Office for the National Park Service in Yosemite, Mr. Vander Karr, personal telephone calls placed to some occupants at the discretion of the housing office staff, and if obvious discrepancies appeared to concern Mr. Vander Karr, a personal visit was made to the GFQ in question, *if* time permitted. It was this procedure which was employed by the Yosemite Park personnel to complete the inventory GFQ's in Yosemite—this inventory being an essential and integral of the rent adjustments for Yosemite GFQ's.

Testimony through government witnesses also established that 30% of the GFQ's in Yosemite do not meet minimal insulation requirements. Indeed, at the time of the hearing, an insulation contractor was in the process of installing insulation in these units. The survey contractor, of course, had been directed to survey those dwelling units that were built to Housing and Development (HUD) minimum standards whenever possible.[5]

The initial GFQ inventories received from Yosemite and other areas contained numerous errors, and requests were made for correction. The Court was provided with no information as to the nature of these errors, or what verification procedures the Department of the Interior personnel employed to assure themselves that the errors had been corrected.

C. *The Establishment of the Basic Rental*

After the Regional survey data was collected, categorized and fed into the computers, it was subject to a statistical process described as multiple regression procedure. It was the belief of the appropriate officers of the Department of the Interior that the use of this technique "allows the analyst to establish a basic rental rate for a given type of housing in the survey area." In addition, it was designed to reflect, assess and adjust for the contributory values, plus or minus, of housing features that the private rental market indicates are significant, such as the identification and special treatment of relevant social and economic factors, and the impact of major recreational uses or mining and mineral operations.

The end product was a basic rental schedule on each category of housing which was furnished to each agency to compute the basic rental rate on each GFQ in its domain.

D. *The Local Adjustment Process*

After the basic rent for each type of housing was developed from the survey data, this material was sent to each local agency, including Yosemite National Park, to set the basic rent for each GFQ. Thereafter, certain required administrative adjustments are applied to the individual basic rent. This process, in Yosemite, went forward in fits and starts.

Factually, the following events occurred in Yosemite National Park. On or about February 6, 1983, the members of the plaintiff association and other occupants of

---

**5.** What the HUD minimum standards were, of course, was not developed in the testimony. However, the Court notes many of the dwellings inventoried in Yosemite as well as those reported in the region survey were of an age that suggested they were built years before HUD or its predecessor agencies first were concerned with minimum housing standards.

GFQ in Yosemite were notified of the increased rental rates. This was first notification to park employees that such a procedure was being undertaken and the impact it would have upon them individually. As a result of this notification, an open meeting with the Yosemite employees was held on February 10, 1983. There is little evidence as to what occurred at that meeting.[6]

As a result of this first meeting Superintendent Binnewies addressed a letter to his superiors in the Department requesting a review of the rental increases as they affected Yosemite. Apparently, he was dissuaded from a suggestion contained in his memorandum that the statewide survey was not equivalent to an economic homogeneous area within which the rental units (GFQ's) were located, and instead a second meeting was set up at which representatives from the Washington Office of the National Park Service and the Regional Office of the National Park Service and the Rocky Mountain Regional Office of the National Park Service were in attendance.

After an outcry arose upon the first notification of the rental increases, the management at Yosemite Park formed a committee[7] to evaluate the amenities[8] available to each of the GFQ's in Yosemite. It should be noted that this committee was not appointed and did not function until after each occupant of GFQ's in Yosemite had been initially apprised of their adjusted rental rate.

At the time of the rentsetting process, and continuing up until the time of the hearing in October of 1983, several of the units—particularly the trailer units at El Portal—were admittedly in need of substantial maintenance. No rental adjustment was made for lack of insulation, and a flat 13% reduction was made with regard to the trailer units in need of maintenance, regardless of the condition of the unit. One trailer in the Wawona district was declared obsolete, and the occupant rental was reduced by 50%. The occupant was also administratively made eligible for relocation to other quarters.

Presumably all of the foregoing adjustments would have been reflected had an adequate physical inventory have been maintained for the Yosemite GFQ's.

41 C.F.R. 114–52.3 lists other adjustments to basic rental rates which must be made by each agency when applicable. They are as follows:

*Unusual transportation costs* (41 C.F.R. 114–52.302). This deduction was

---

**6.** Superintendent Binnewies apparently was not informed of the progress of the private market survey or the schedule for the implementation of the rental increases until early January, 1983. It is obvious, however, that the Department did not comply with its own regulations which wisely encourage the involvement of the affected employees during the rentsetting process. *See* 41 C.F.R. § 114–52.601.

**7.** The Code of Federal Regulations in this regard are even more adamant. The guidelines suggest that a tenants' committee be in place during all stages of the rent adjustment process. *See* 41 C.F.R. § 114–52.601.

**8.** 41 C.F.R. 114–52.303, provides in pertinent part: "An adjustment in the basic rental rate shall be made to reflect differences in amenities (higher or lower) which may exist for rental quarters in relation to those of the private housing used for comparison. Adjustment for amenities is limited to consideration of those amenities listed in § 114–52.105(f)."

41 C.F.R. 114–52.105(f), Amenities, provides:
Amenities include:
(1) Paved streets.

(2) Street lighting at least at intersections.
(3) Sidewalks.
(4) Lawns, trees, and landscaping.
(5) General attractiveness of the neighborhood.
(6) Community sanitation services.
(7) Reliability and adequacy of water safe for household uses.
(8) Reliability and adequacy of electrical service.
(9) Reliability and adequacy of telephone service.
(10) Reliability and adequacy of fuel for heating, hot water, and cooking.
(11) Police protection.
(12) Fire protection.
(13) Unusual design features of the dwelling.
(14) Absence of disturbing noises on [sic] offensive odors.
(15) Standards of maintenance.
Presumably, the requirement of an annual physical inspection of each GFQ, if performed at Yosemite, would have contained this information and made this belated survey unnecessary.
The Committee contemplated by the regulations was designed to serve other purposes.

made using Mariposa as the nearest established community. There was no evidence introduced from which the Court could ascertain that this determination was not correct.

*Adjustment for differences in amenities* (41 C.F.R. 441-52.303). A committee was formed to consider these deductions or additions after the fact. No one from the committee was called. The committee report indicates only a limited number of GFQ's considered in its report. The record is silent on whether the remaining units were considered.

*Invasion of privacy* (41 C.F.R. 114-52.-304). Again, the administrative record would indicate that there was no attempt made to investigate whether any of the GFQ in Yosemite qualified for this deduction. Letters of appeal contained in the administrative record indicate that several persons claimed this deduction, but at the time of the hearing, the appeal process was completely bogged down.

*Excessive size or quality* (41 C.F.R. 114-52.305). The rental adjustment scheme provides for increasing the occupant's rent in the event that the GFQ occupied is excessive as to size and quality for the occupant's needs or that of his family. The inventory as maintained by the housing office in Yosemite Park did contain information from which this determination was made.

*Inadequate size* (41 C.F.R. 114-52.306). This section sets forth the criteria for determining whether or not the quarters occupied by the occupant or his family are inadequate for his needs.

The Park administration, however, did make an initial determination of the adjusted rental to be charged for each GFQ in Yosemite effective May 1, 1983, and each tenant was notified of the adjusted rental for which they would be liable.

The Park administration, being somewhat insecure as to the correctness of its procedures, particularly with regard to its own inventory of the Yosemite GFQ's, sent out a memorandum to each affected occupant on May 19, 1983. That memorandum, in pertinent part, stated:

Subject: Quarters inventory review

A committee has been formed to review the quarters inventories which were used to determine new rental rates. The committee will provide an analysis of each quarters parkwide as to the 15 amenity adjustments. The amenities to be rated include paved streets; street lights; sidewalk; lawns, trees and landscape; neighborhood attractiveness; sanitation; water service; electric service; telephone service; fuel service; police protection; fire protection; acceptable design, acceptable noise and odors; and acceptable maintenance level.

Attached for your review is a copy of the inventory on your quarters which was done in December 1980 according to guidelines of the California rental survey project. Please review this form as to accuracy, particularly in reference to the interior of your house. The special committee will not be entering your quarters. If, after reviewing the guidelines, you find a discrepancy on the attached form, please make corrections and return the form to the Housing Office by June 1. Also, please notify the Housing Office if you agree with the inventory.

The Housing Office invites you to become involved and take the opportunity to analyze your quarters. Final adjustments and rent changes are expected to be complete and notice of such mailed by July 7.

In addition to adjustments based on this notice, further in-house adjustments were going on. For instance, the entire trailer rental village at El Portal was reduced from a category of "fair" to a category of "poor" resulting in a rental reduction for the occupants of those particular GFQ's. The uncertainty created by this failure to follow established procedures is illustrated by the net rental rate for Unit 7818 G3, El Portal. The revised net monthly rental rate for this unit effective February 10, 1980, was $166.00. The occupant was next notified that effective May 1, 1983, the net monthly rental charge would be $242.37.

Finally, the occupant was then notified that the rent was reduced to $191.80 per month, that being 20% of her salary.[9]

Finally the Court notes that the administrative process allows for one appeal by an occupant who is dissatisfied with the final adjusted rental fixed for his or her quarters. 41 C.F.R. § 52.602, provides in pertinent part that:

(a) Occupants shall be notified of their rights to appeal rental rates, adjustments or other changes when they believe the quarters have been improperly classified, rates have not been established within these guidelines, or rates do not reflect reasonable value to the employee-tenant;

(b) The appeal must be in writing;

(c) The appeal should be filed within 10 days following receipt of notice of the change in rate;

(d) A further appeal is permissible to the Office of Hearings and Appeals if the appellant is dissatisfied with the initial determination by a bureau official.

The Yosemite GFQ occupants were notified of their right to appeal, and many have done so. Complaint was made during the hearing of the speed, or rather the lack thereof, exhibited by the National Park Service in dealing with these appeals.

IV

*The Plaintiffs' Attack*

The plaintiffs' attack upon the adjusted rental rates, as gauged by the pleadings, centers upon the alleged failure of the defendants to comply with the federal regulatory procedures in arriving at the final rental charges in Yosemite; that the procedures that were used varied substantially from those which the OMB and the Department itself designed to carry out the process, rendering the entire procedure arbitrary and capricious, exceeding the administrative authority granted to the defendants; and finally, that regulatorily mandated adjustments were not made prior to the imposition of the rental figure on each GFQ.

The government, of course, has generally denied the allegations, and relies heavily upon the generally recognized principle that judicial deference be given to agency action. In addition, the government has filed the affirmative defenses of failure to state a claim, failure to exhaust administrative remedies, and failure to join indispensable parties.

A. *The Statistical Model and the Multiple Regression Procedures Used in the Determination of the Yosemite Rates.*

In the Summary contained in the Technical Standards for Multiple Regression Analysis For Use In Government Housing Rent Determination of the Model prepared by Dr. Ralph Brown for use in this case, Dr. Brown outlined the contractor's duties as follows:

1. Variables—The variables used as independent variables should be based on the private rental survey form shown in Figure 1.

2. Variable form—The variables utilized should be a combination of continuous, dummy, interaction, and nonlinear variables.

3. Stepwise regression—A stepwise regression analysis should be used to estimate the rent equation. Preferably an in-an-out stepwise regression be [sic] used.

4. Minimum Standard Error Criterion—The equation should be chosen so as to minimize the standard error of estimate for the equation. The equation which meets this criterion will also maximize the corrected coefficient of determination and include only those variables whose absolute value of their t values are equal to or greater than one.

5. Heteroscedasticity—The regression equations should be tested for the existence of heteroscedasticity.

6. Multicollinearity—The researcher should be familiar with the concept and consequences of multicollinearity.

---

**9.** Apparently after the magnitude of the rental increases in relation to the salaries of the occupants of the Yosemite GFQ's was made apparent, an administrative decision was made to limit the rental increases to 20% of the occupant's salary. A minimal number of occupants did receive rental decreases as a result of this administrative decision.

7. Outliers—Outliers should be examined and reasons for their existence should be studied. If they exist due to data error or poor samples they should be eliminated from the model. If no reasonable explanation can be determined for their existence they should be eliminated only if it is felt that their inclusion will bias the regression coefficients.

8. Stratification—Stratification of the data into more homogeneous groups is legitimate, but it should not be carried to the point of over-parameterization of the data.

9. Ten Percent Error—In addition to the minimum standard error criterion the regression should provide a degree of precision of a 10 percent or less mean absolute percent error.

Plaintiffs' first attack is upon the procedure employed by the government in creating the statistical model used to predict the base rents to be applied to the GFQ's in Yosemite. The original model, as outlined (which is known in statistical circles as a multiple regression analysis) was found to be acceptable by the plaintiff's expert, Dr. Stanley Taylor. However, Dr. Taylor complained that the government employees charged with the execution of the model did not follow the model originally outlined thus rendering the results undependable. The procedure as actually employed by the government in establishing the model was deficient in the following particulars:

1. The sought-after dependent variable, which in this model ideally would be rent, was established by dividing rent by predicted rent. Dr. Taylor was unable to find any justification for this method in statistical literature, and totally rejected the justification advanced by the government to use this method. He would have taken rent and regressed it on other variables, since rent is what the process was designed to predict.

2. There was a lack of validation studies in the work performed by the government employees. Dr. Taylor observed that if you are going to use a statistical model for actual predicting purposes, it should be tested to see how well it performs as compared with actual data.

3. An unusually low percentage of the dependent variables was used in each of the regression runs.

4. There were none of the interaction terms contained in the model actually used. The model, as written by Professor Brown, stated that interaction terms had to be used liberally. Brown originally explained that the use of interaction terms makes the model and all of its predictions more precise. Dr. Taylor found no interaction terms when he inspected the model.

5. Of the 24 variables included in the final model for houses, for instances, 14 of them were dummy variables. These dummy variables, Professor Taylor concluded, were not helpful in predicting rents in Yosemite National Park.

6. No validation study was ever run.

Over the weekend recess, the government contacted the author of the model. Professor Brown then consulted with the person who actually supervised the "construction" of the model, as well as some colleagues in the same discipline, and based on this ex parte communication, testified, in effect, that the deviations from the model, although not previously approved by him, were satisfactory and did not affect the validity of the model. Professor Brown was never asked, nor did he testify, why he included the omitted steps from his directions when he originally constructed the model. Professor Brown admitted that the error in housing data was 13.5%, and the error on mobile home housing was in excess of 10%. In some instances, errors could have been as high as 25% or 30%, positive or negative.

It should be noted that in his formulation of the model, Professor Brown wrote: "The objective should be to choose the equation which minimizes the standard error of the estimate and provides a degree of precision so as to have an 'underlying mean absolute error of 10% or less.'" Dr. Brown was never asked nor did he volunteer any satisfactory answer as to why a

statistical model that admittedly displayed a substantially greater average error was acceptable.

Dr. Brown did not testify as to what percentage of error was acceptable in this field, nor did he attempt to answer the specific criticisms of Dr. Taylor.

In conclusion, Professor Taylor stated that without having the entire set of computer tapes, he could not say with any degree of certainty what the result would be if the statistical regression analysis had been completed precisely as Professor Brown had outlined it in his technical standards.

Clearly, the Court is entitled to an explanation, and, if possible, a demonstration that the omissions from the model, as constructed by Dr. Brown, did not materially alter the accuracy of the survey. While the Court recognizes that statistics is not an exact science, it also is aware that statistical procedures have been developed to enable economic phenomenon to be predicted within fairly precise ranges. Further, there should be some explanation as to why a model designed to produce a "mean absolute error of 10% or less" was still acceptable when it produced a much greater error in all categories of housing surveyed.

### B. The Problem of the Economically Homogeneous Area

At the outset, it should be noted that neither counsel addressed this problem in their presentation of oral or documentary evidence. However, the issue, in the Court's view, is basic to this entire controversy.

First of all, it should be remembered that OMB Circular No. A–45, revised, dictates that when a regional survey is undertaken, that the following considerations are mandated in establishing the region. 41 C.F.R. 115–52.105(h) defines an economically homogeneous survey area as follows:

A permanently defined geographic area within which the living costs and related economic conditions, including the rental rate structure for comparable private rental housing, are generally uniform. Such areas should be as large as possible

to facilitate an adequate and efficient survey program. If possible, the survey area should conform to State or multi-State boundaries.

Homogeneous is defined by Webster's New Collegiate Dictionary and Webster's Unabridged Dictionary as "of the same or similar kind or nature," or alternately, "of uniform structure or composition throughout."

We turn to a consideration of the administrative record, in an attempt to determine whether or not the mandates of the regulatory admonitions have been met.

As previously noted, the appraisers, in organizing their appraisal, included a brief description of each community surveyed.

George Sandberg, Chief of the Division of Real Property, and responsible for policy development in real estate matters for the Secretary of the Interior, presumably was the person in charge of the entire program of regional surveys conducted by the Department of the Interior to implement the rental adjustments on GFQ's. As previously stated, the foregoing 40 communities were chosen from a larger list of 200–400 submitted by the various units of the Department of the Interior who would be impacted by the proposed rental increases. Neither in his affidavit nor declaration, or alternately in his oral testimony, does Mr. Sandberg address his concept—and hence the Secretary's—of the meaning of the term "economically homogeneous area." Instead, he dwells on the numbers of comparable units surveyed, as well as other matters not germane to the question. Mr. Sandberg's conclusion that the more units surveyed results in a higher degree of accuracy of predictable average rentals as reflected in the market place may be correct; however, that is not what the authors of the regulations contemplated. They contemplated, rather, that the rentals by which GFQ rents were to be fixed, were to come from an area that is economically homogeneous with the location of the affected GFQ's, i.e., that the market sur-

veyed should be "of same or similar kind or nature" as the affected GFQ's.[10]

A quick glance of the descriptive material appended to each community, by the contract appraisers, immediately illustrates the disparate economies of these communities, and explicitly or inferentially the impact such conditions have on housing prices within the communities surveyed.

The Court, of course, is not the first to note this problem. On February 16, 1983, Superintendent Binnewies wrote to the Regional Director of the Western Region, in pertinent part, as follows:

> Chapter 114–52.105(h) defines an Economically Homogenous Survey Area (EHSA) as a "geographic area wherein the living costs and related conditions, including the rental rate structure for comparable private rental housing, are generally uniform. Such areas should be as large as possible to facilitate an adequate and efficient survey program. If possible, the survey area should conform to state or multi-state boundaries." Considering the state of California is 800 miles long and 375 miles wide, with a population exceeding 23 million, there can be little doubt that it represents the broadest spectrum of economic diversity. A recent survey conducted by the San Francisco Chronicle newspaper on housing costs for the State of California depicted a "standard" house, consisting of 3 bedrooms, 2 baths, and 2,000 square feet of floor space, would be valued at $225,000 in San Francisco and only $82,000 in Fresno. By no reasonable criteria or assessment can the State of California be considered a geographic area in which living costs and related economic conditions are uniform.

When questioned about this letter, Superintendent Binnewies indicated that he was later convinced that this view was in error after the March 22nd meeting in Yosemite attended by representatives of the Washington office as well as the Regional office. It is not the purpose of the Court now to speculate on the methods and means used to change his opinion; however, it is the conclusion of the Court that the original opinion expressed by Superintendent Binnewies in his letter of February 16, 1983, is absolutely correct, and should have been heeded by his superiors.

## V

### Plaintiffs' Standing to Maintain this Action

5 U.S.C. § 702, provides in pertinent part as follows:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any action, and a judgment or decree may be entered against the United States: ...

The statutory and regulatory scheme providing for the periodic adjustment of rentals in GFQ's is clearly agency action. By the alleged failure of the Interior Department to follow the prescribed administrative steps in adjusting the rentals, the plaintiffs here are clearly persons who are aggrieved by agency action. The United States Supreme Court in *Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), enunciated a two-prong test to determine plaintiff's standing to challenge agency action:

1. Has the plaintiff alleged that the challenged action has caused him injury in fact, economic or otherwise; and

---

**10.** The Government would justify its procedures here by testimony that the same methods were used in other states. Such a conclusion, of course, is not determinative of the factual and legal issues raised in this case.

2. Whether the interest sought to be protected by the plaintiff was arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question.

Clearly, plaintiffs' allegations and proof satisfy these tests.

■ Further, we note that the Department of the Interior and its Secretary are subject to the provisions of the Administrative Procedures Act. *See Glacier Park Foundation v. Watt,* 663 F.2d 882 (9th Cir.1982).

## VI

*Are the Plaintiffs Required to Exhaust Their Administrative Remedies?*

■ As pointed out above, an individual tenant quartered in the GFQ's may apply for an administrative review of the rental imposed upon his or her quarters. The review, however, is limited to a consideration of whether or not the agency has properly classified the quarters with regard to either its amenities or other characteristics that would affect the ultimate rental paid. The administrative review does not enable the tenant to complain as do the plaintiffs here. The basic rental adjustment upon which further individual refinements are based is properly fixed.

Further, the Court notes that the agency in the instant case completely ignored the suggestion that the occupants be kept informed as to all steps of the adjustment process, although not actually allowed to participate in the ultimate decision. While this does not constitute an administrative remedy in the usual sense of the word, had it been followed, some of the defendant's difficulties may have been diminished or completely avoided.

Finally, it should be noted that nowhere in the administrative process has there been any provision for an administrative review of the agency action fixing the basic rent for the various classifications of housing here under consideration. Hence, the controversy satisfies the standard requirements that the agency action is final, and there is no other adequate judicial or administrative remedy available to the plaintiffs in their quest for relief.

## DISCUSSION

■ Clearly, the plaintiff has not established the Secretary's action to be violative of any constitutional rights, powers, privileges or immunities afforded to the plaintiffs. The procedure embarked upon was authorized by Congress and undertaken pursuant to lawful authority granted to the executive branch by Congress. The act *per se* was not in excess of any statutory authority nor was it arbitrary or capricious. Neither was it an abuse of discretion inasmuch as the acts are not *per se* vested within the discretion of the Secretary; the ambit of agency action is precisely proscribed by OMB Circular 45, as revised.

There is substantial evidence that the rates set on the GFQ's, which are in issue in this case, were not set in accordance with the administrative procedures which the Secretary has mandated be followed in the rent setting process. This failure, of course, may not result "in the charges for facilities made available in connection with the occupancy of the quarters, shall be based on the reasonable value of the quarters and facilities to the employee ..." (5 U.S.C. § 5911(c), *supra.*)

It appears to the Court that the issue facing the Court in this case is akin the problem encountered by the Ninth Circuit Court of Appeals in *Yong v. Regional Manpower Admin., U.S. Dept. of Labor,* 509 F.2d 243 (9th Cir.1975). There, Yong was appealing denial of his application for alien employment certification. It appeared that in arriving at this decision, the Regional Manpower Administrator had not followed the regulations promulgated under the applicable statute, namely, 8 U.S.C. § 1182(a)(14). There, the court stated: "The reviewing court must decide whether the agency observed the 'procedure required by law' (5 U.S.C. § 706(2)(D)). The statute itself does not define the quoted terminology.",

Although we deal with a different kind of administrative agency action here, there

is really a close relationship between the two factual situations. In this case, as noted above, the rental which plaintiffs are being charged was based on a survey of 40 cities scattered all over the State of California. This regional survey, by the Secretary's own regulations, was to have been confined to an "economically homogeneous area in which the housing is located." Had the Secretary or his designee considered the issue of economic homogeneousness and made a finding thereon, the Court would have been required to give deference to the Secretary's determination. Rather, this administrative record reflects that the Secretary purposely chose not to select an economically homogeneous community, and substituted an unauthorized methodology. The only evidence is that these cities were chosen from a list of cities previously used for comparable rent determinations is not such a finding. Significantly, there is no evidence that these 40 cities were all used previously for the determination of rental increases for GFQ's at Yosemite. Indeed, the entire thrust of the defendant's evidence is that administrative convenience, rather than regulatory compliance, was the sole consideration of those conducting the rental survey.

Our finding, however, that the requisite procedures were not followed in this case does not end our inquiry. The last phrase in 5 U.S.C. § 706 directs that "due account shall be taken of the rule of prejudicial error." The Ninth Circuit stated in *N.L.R.B. v. Seine and Line Fishermen's Union of San Pedro*, 374 F.2d 974, 981 (9th Cir.1967), as follows:

> In accord with section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 1009(e) a court, on review of an administrative determination, should take due account of the rule of prejudicial error. Procedural irregularities are not per se prejudicial; each case must be determined on its individual facts and, if the errors are deemed to be minor and insubstantial, the administrative order should be enforced notwithstanding. Moreover,

"the burden of showing that prejudice has resulted" is on the party claiming injury from the erroneous rulings. (citations omitted)

This record is replete with evidence of the amount of the increases both individually and collectively, as well as their economic impact upon the individuals subjected to them. Indeed, the government's evidence indicates that the current rental increases will produce approximately $144,000 during a twelve month period. The Court also notes that the rental revenue generated is used for the maintenance, operational and administrative costs of the quarters program for the park. It does not produce a profit for the park or the government. As the Court stated at the time it denied plaintiffs' application for a temporary restraining order, it is not the purpose of the Court to determine how much any or all of the tenants of GFQ's in Yosemite National Park must pay. Alternately, it is not the function of the Court in the framework of these proceedings to determine the adverse affect upon the maintenance and operation of the quarters program in Yosemite National Park in framing its decision.[11] Further, it should be noted that neither the statutory mandate (reasonable value) or the administrative mechanisms are geared to the prediction of any particular level of income for the maintenance and operation of the GFQ's at Yosemite.

Having determined that procedural defects occurred with regard to the rent setting procedure, the Court must properly look to these facts to determine whether or not the Secretary's actions constitute prejudicial error. The Court determines that prejudicial error has been demonstrated.

Other factors could be pointed to to establish plaintiff's entitlement to relief. While the plaintiffs' expert witness could not testify as to the precise differences, if any, occasioned by the failure of the government to precisely follow the regression analysis of Professor Brown, Profes-

---

11. There was no evidence that the cash flow produced by the previous rental rates on the Yosemite GFQ's were inadequate to properly fund the maintenance, operations and administrative costs.

sor Brown was forced to admit that the method employed by the government resulted in a substantially greater average error than he originally designed into his program. The defendants did not introduce any evidence that the greater margin of error had de minimus effect upon the ultimate rental structure.

Further, as is pointed out in the Court's discussion above, the failure of the Yosemite Park administration to maintain and adequately update their quarters inventory greatly delayed their ability to make certain administrative adjustments and has completely prevented them from making others. These factors, too, inure to the cumulative affect of the prejudicial effects suffered by the plaintiffs as a result of the administrative conduct.

### REMEDIES

■■■ The Court's power to fashion relief under 5 U.S.C. § 706 is limited. The specific relief being sought here by the plaintiffs, of course, is a preliminary injunction to maintain the *status quo ante* pending a determination of the action on the merits. The considerations that the Court must weigh before granting such relief are covered in this Circuit by *Los Angeles Memorial Coliseum Com'n v. Nat. Football*, 634 F.2d 1197 (9th Cir.1980), wherein the Court stated:

> A fundamental principle applied in such courts is that the basic function of a preliminary injunction is to preserve the *status quo ante litem* pending a determination of the action on the merits. *Larry P. v. Riles*, 502 F.2d 963, 965 (9th Cir.1974); *Washington Capitols Basketball Club, Ind. v. Barry*, 419 F.2d 472, 476 (9th Cir.1969); *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804 (9th Cir.) *cert. denied*, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963). The traditional equitable criteria for granting preliminary injunctive relief are (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not

granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). *Sierra Club v. Hathaway*, 579 F.2d 1162, 1167 (9th Cir.1978); *Munoz v. County of Imperial*, 604 F.2d 1174, 1175–76 (9th Cir.1979) *cert. granted* 445 U.S. 903, 100 S.Ct. 1077, 63 L.Ed.2d 318 (1980); *County of Alameda v. Weinberger*, 520 F.2d 344, 349 (9th Cir.1975). In this circuit, the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Inglis [& Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 285], *supra*, 526 F.2d at 88. These are not separate tests, but the outer reaches "of a single continuum." *Benda, supra, [Benda v. Grand Lodge of International Ass'n of Machinists*, 584 F.2d 308], 584 F.2d at 315.

The Court finds that the plaintiff has adequately met the first prong of this test, namely, a combination of probable success on the merits and the probability of irreparable injury. While monetary loss is usually not considered irreparable injury, this case presents a unique fact situation. The monies which are collected from occupants of GFQ's in Yosemite National Park are quasi-trust funds in the sense that they are used to operate, administer and maintain the quarters program in the Park. No other funds are currently available for that purpose. Unless the Park is assured of a stable income, it will be difficult, if not impossible, for the administration of the Park to properly budget for the maintenance and service of the quarters. It is important, therefore, that the Secretary be apprised, as quickly as possible, what the level of these funds will be.

As to the individual tenants, the administrative record reveals there are instances of individual hardship that could not be adequately rectified by a lump sum refund later on.[12]

---

**12.** The Court's reading of the applicable regulations suggests that the excess rental payments will be returned in the form of credits on a new rental schedule.

Serious questions are raised by this case. Plaintiffs' exhibits indicate that the Department of the Interior already contemplates a similar exercise in the Spring of 1986, using the same statewide survey boundaries in order to establish a rental adjustment effective November 1, 1986. It is important that the mistake of 1983 not be repeated three (3) years hence.

Clearly, the balance of hardships tips sharply in the plaintiffs' favor in this regard. It is important that the program which the Department intends to apply to California in the future be regularized and stabilized so that the tenants, on the one hand, may know precisely what rental they will be required to pay in order to allocate their limited resources to meet their daily expenses.

For, all of the foregoing reasons, the Court finds that the plaintiffs are entitled to a preliminary injunction. That finding does not end the Court's concern in the matter, however. The Secretary in this case has several alternatives. Some of them are as follows:

1. To break out from the existing regional survey an area which, after appropriate consideration, the Secretary finds to be economically homogeneous to Yosemite National Park; then, using the available data make further "computer runs" in the manner originally mandated by Professor Brown.

2. Revert to one of the other alternate methods of increasing rentals mandated by OMB Circular A-45, revised, pursuant to the procedures prescribed therefor contained in Title 41 of the Code of Federal Regulations.

3. Request an early date for a hearing on the merits (which the Court is willing to grant), and attempt to justify the procedures used in the instant ratesetting process.

4. Seek certification for an interlocutory appeal.

Perhaps there are other alternatives that the Court has not envisioned, inasmuch as the Court naturally is not privy to the considerations and concerns of the Secretary in this regard.

Accordingly, the Court is concerned that the preliminary injunction be fashioned in such a manner that the Secretary be given appropriate discretion and flexibility in responding to the problems that this preliminary injunction may cause.

Counsel for the parties are directed to appear before the Court on Monday, April 2, 1984, at 2:00 p.m., at Sacramento, in a Courtroom to be announced, to discuss with the Court the appropriate formulation of the injunction.