COURT OF APPEALS OF VIRGINIA


Present:   Judges Bumgardner, Clements and McClanahan
Argued at Richmond, Virginia


MAURICE A. JONES, COMMISSIONER,
  VIRGINIA DEPARTMENT OF SOCIAL SERVICES
                                                    OPINION BY
v.        Record No. 2144-04-2          JUDGE JEAN HARRISON CLEMENTS
                                                    AUGUST 9, 2005
TOMMIE J. WEST


                FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                            Michael C. Allen, Judge

            A. Cameron O'Brion, Assistant Attorney General (Jerry W. Kilgore,
            Attorney General; David E. Johnson, Deputy Attorney General;
            Kim F. Piner, Senior Assistant Attorney General, on briefs), for
            appellant.

            Gail H. Miller (Gail Harrington Miller, P.C., on brief), for appellee.


        Maurice A. Jones, Commissioner (Commissioner) of the Virginia Department of Social

Services (DSS), appeals from a decision of the Circuit Court of Chesterfield County (circuit

court) setting aside and ordering the dismissal of a child protective services founded complaint of

sexual abuse against Tommie J. West because the Chesterfield/Colonial Heights Department of

Social Services (local department) failed to comply with certain procedural requirements in its

investigation of the complaint.  The Commissioner contends the circuit court erred (1) in

determining that the local department's decision not to tape record its interview with the alleged

victim constituted a procedural violation, (2) in concluding that the local department's

procedural violations were not mere harmless error, and (3) in ordering the dismissal of the

complaint against West instead of remanding the case to the hearing officer for further

adjudication. On cross-appeal, West contends the circuit court erred in failing to award him attorney's fees and costs. For the reasons that follow, we affirm the circuit court's judgment.

## I. BACKGROUND

On March 29, 2002, the child protective services unit of the local department received a complaint alleging that S.J., a fourteen-year-old girl, may have been sexually abused by West, a friend of S.J.'s family, while she was in West's care. In response, Jami K. Robinson, a social worker with the local department, and Detective Rick Meadows of the Chesterfield County Police Department conducted a joint investigation of the complaint against West.

Detective Meadows and Robinson interviewed S.J. at the local department office that same day. The interview was not tape recorded. On April 2, 2002, Meadows interviewed West at the police station while Robinson observed from another room. The interview was not tape recorded, and West was not informed of his right to tape record the interview. At the conclusion of the interview, Robinson entered the interview room, introduced herself to West, gave him written notification of the complaint of sexual abuse lodged against him, and explained that she was conducting the child protective services investigation on behalf of the local department. Based on the interviews with S.J. and West, Robinson issued a disposition of "Founded, Level 1, sexual abuse" against West, on May 20, 2002.

Following a stay for the resolution of a related criminal charge,[1] a conference appeal was held by the local department on July 24, 2002. By letter dated August 8, 2002, the local department upheld the founded disposition.

West appealed the decision to the Commissioner, arguing, *inter alia*, that the local department's failure to comply with certain procedural requirements during the investigation

_____

[1] West entered a plea of *nolo contendere* to the charge of misdemeanor assault and battery, Code § 18.2-57, and the juvenile and domestic relations district court deferred disposition of the charge for two years.

rendered the founded disposition invalid and that the investigatory evidence obtained by the local department did not support the founded disposition. Specifically, West argued the record did not show that West had the requisite "intent to sexually molest, arouse or gratify" when he touched S.J. in what he claimed was a "playful and friendly" manner or that S.J. suffered serious harm as a result of the touching. The administrative hearing officer designated by the Commissioner to hear the appeal conducted an evidentiary hearing on March 27, 2003. The local department's investigative record was made a part of the hearing record.

Robinson's account of the March 29, 2002 interview with S.J., which was included in the investigative record, read as follows:

> [S.J.] stated that Tomm[ie] West is about 70 years old, and is married, and used to be their next-door neighbor. She calls him Grandpa and has known him since 1997. She stated that nothing had happened before this school year and the last incident was on Thursday (the previous day). [S.J.] reported that [West] would put his hand high up on her leg and she told him to stop, that she didn't like it. This would occur in the car and was an every day thing. He would grab her whole leg, up near the crease, where her leg meets her hip, and sometimes his fingers would brush against her genitals. This always occurred over her clothes, not under them. [West] will often ask her for a hug before he leaves and he has grabbed the bottom of her butt and lifted her off the ground. He then holds her against him for 35 seconds, until she asks him to let her go. This has happened 3 times, the last time being last Friday. [S.J.] stated that he tells her how pretty she is, "like the girls in magazines." When [S.J.] would tell [West] that she didn't like it, he would say to her, "You don't love me any more," and act disappointed. [S.J.] stated that sometimes, while they were in the car, he would reach over and rub her chest, not her breasts, but her upper chest, near her neck, with the palm of his hand. If she were wearing a lower cut shirt, he would touch skin sometimes. [S.J.] stated that she has to physically remove his hand from her and he says to her that he would never do anything to offend her. The last time that this happened was last week. [S.J.] stated, when asked, that sometimes he brushes her breasts, but not every time. [West] has never asked her to touch him in any way. [S.J.] reported that [West] has said to her that he wants to see her naked before he dies. When this happens, it is sort of a random comment, with nothing leading up to it. He has also asked to see her underwear and he asks her often what color they are.

However, one time [West] brought her over a birthday cake, and she had on some low cut jeans, and her underwear was showing a little bit. [S.J.] stated that [West] came over to her and pulled her underwear up so that he could look at them (she thought he was joking with her and giving her a wedgie). He commented on how pretty they were, and went on and on about them. [S.J.], when asked, speculated that all of this just started happening because of the opportunity, he hasn't had any prior to this year. [S.J.] mentioned one more thing that she thought was inappropriate—[West] once said to her that he liked to see her roll around on his floor with her skirt pulled above her head when she was little. [S.J.] thought that was weird.

Robinson's account of Detective Meadows's April 2, 2002 interview with West, also a part of the investigative record, read as follows:

Mr. West stated that he has known the family for a while now and he figured he'd been running errands for them for 6 years. He stated that sometimes he would reach over in the car and hit [S.J.] on the leg jokingly, but never really high up on her leg. He stated that he would never do anything to [S.J.] or [her sister], he thinks of them as his own kids. Mr. West stated that he has pinched her on the leg in a playful manner, but he has never touched her on her privates, because he's "too old to even think anything." Mr. West stated that sometimes they hold hands, but he has never touched her breasts. He stated he has stroked her face before and grabbed her chin, but nothing further. . . . When asked specifically about grabbing [S.J.'s] underwear, Mr. West stated that he hasn't ever done that. He stated that he has pinched her butt before and one time when she hugged him (she's always hugging him), he said to her, "I oughtta pinch your little butt." [S.J.] said OK and he did. He stated that this happened maybe twice. . . . When asked if he had ever made comments about her underwear he stated that he had; things like, "you've got pretty blue panties on today." . . . When asked if he had ever told her that he would like to see her naked, he replied that he had once told her that if he had the money, he would give it to her to get those clothes from Victoria's Secret because "she would be a work of art." Mr. West stated that [S.J.] often hugs him and rubs her breasts on his shoulder and that she has sat in his lap before, but that he never touched her privates.

Mr. West reported that he has never touched [S.J.] inappropriately, but then stated that on Thursday when he was touching her, she told him that he needed to stop because she didn't like it. He told her that he would stop. When asked specifically if he had made a comment about wanting to see her naked before he died, Mr. West stated that if [S.J.] said that he said it then he might have, but he didn't really remember. Det. Meadows stated to Mr. West

- 4 -

that everything [S.J.] had told him, Mr. West was admitting to, except touching her chest. He agreed that he had done all of the stuff that he said, but remained sure that he didn't touch her breasts.

The hearing record also included a statement prepared by Detective Meadows regarding his interview with West:

I spoke to the suspect on 4-2-02. . . . Jami[] Robinson observed. The suspect stated he didn't know where this was coming from. He did say that on the way home he would sometimes grab her leg and squeeze it and demonstrated and it was fairly high on the leg a couple inches away from the vagina area. He states that he has hugged her and one time he said "I feel like squeezing your little buns" and that the victim said "go ahead I would like that." He says this has happened a couple times. He states that he has made comments about her underwear when he saw it out of her pants by saying "you have pretty underwear on today" and he did tell her once that if he had lots of money he would take her to Victoria Secrets and let her buy everything because she would be a work of art. He says he has done these things but has no sexual intentions when he does it, that he is just playing with her and teasing her. He says that last Thursday she told him not to grab her leg anymore and he said ok.

Robinson was the only witness to testify on behalf of the local department at the March 27, 2003 hearing. In addition to reiterating much of the information contained in her written accounts of the interviews with S.J. and West, Robinson testified that S.J. stated during her interview that West helped her mother by driving S.J. and her six-year-old sister to and from school. According to Robinson, S.J. further stated that she had a close relationship with West and that, when West did something that made her uncomfortable, she would tell him to stop and he would, "but then it would happen again." Robinson also testified that S.J. stated it made her uncomfortable when West talked about and grabbed her underwear. Robinson further testified that she felt S.J.'s statements were reliable and that S.J. felt bad about getting West in trouble.

Robinson also testified that the interviews with S.J. and West constituted the full extent of her investigation and that the founded disposition she issued was based solely on S.J.'s statement and West's admissions "about what he had done."

When asked why the interview with S.J. was not tape recorded, Robinson explained that, during joint investigations with the police, "the team leader who is the police department in this case is the person that decides whether or not there will be a tape recorder needed. The police do not tape [victim] interviews, so I did not tape it."

On cross-examination, the following exchange between West's counsel and Robinson took place:

> [WEST'S COUNSEL]: Right, so it's an instance where [S.J.'s] in the passenger seat, [West's] in the driver seat and he reaches over and grabs her leg.
>
> MS. ROBINSON: Correct.
>
> [WEST'S COUNSEL]: Okay. And did anybody ask her if that was kind of an affectionate thing that he had done many times in the past?
>
> MS. ROBINSON: I don't know that those words were used, but she said that it made her uncomfortable and she had to remove his hands so I interpreted that as she didn't like it.
>
> [WEST'S COUNSEL]: Okay. What instance was she talking about when she became uncomfortable about?
>
> MS. ROBINSON: When he would grab her high up on her leg and brush her genitals from time to time.
>
> [WEST'S COUNSEL]: But wasn't it this time just before the report [of abuse] that she finally said I don't like it for you to do that?
>
> MS. ROBINSON: That's when she finally said that. Yes.
>
> [WEST'S COUNSEL]: Okay. And as soon as she said that didn't she say that he took his hand away? As soon as she said I don't like it when you do that. Didn't she also say that he took his hand away?
>
> MS. ROBINSON: Yes.
>
> [WEST'S COUNSEL]: Okay. And actually in the interview with Mr. West, he told you about that too. . . .

MS. ROBINSON:  Right.

[WEST'S COUNSEL]:  He said that as soon as she said anything to him that made her uncomfortable he said, okay I won't do it anymore.  And that was the last time he saw her when that interchange occurred.  Is that –

MS. ROBINSON:  That's my understanding.  Yes.

Robinson also testified on cross-examination that, prior to the March 29, 2002 interview with S.J., no discussion was held about whether the interview should be tape recorded.  Robinson further testified that, in demonstrating during his interview how he grabbed S.J.'s leg in the car, West's hand was "midway up" the leg.  Robinson described the relationship between S.J. and West as "affectionate" and testified that "it was common for the two of them to hug."  Robinson further testified that, in responding to a general question about other things West may have done that made her uncomfortable, S.J. did not reveal the temporal or circumstantial context in which West's comments to S.J. about her underwear, his wanting to see her naked before he died, and her being pretty like the girls in the magazines were made.

Testifying on his own behalf at the March 27, 2003 hearing, West denied ever putting his hand on S.J.'s "thigh up close to her genitals."  He admitted that he had touched S.J.'s leg near the knee and her face while driving.  He insisted, however, that the touching was strictly playful and friendly and that he never had "any sexual feelings or intents with regard to [S.J.]."  He further admitted that the subject of Victoria's Secret had come up in a conversation with S.J. but denied telling her that he would buy her any clothes from there.  He and S.J., he explained, were merely discussing the modeling classes she was taking at the time and talking about the "different magazines with modeling" in them that she said her mother had.  West also admitted having had a discussion with S.J. about her underwear once when "she was wearing low-riding pants."  He told her, he explained, that her father, who often disliked the way she dressed, would not "be too happy" that she was wearing her "little underwear."  West also testified that the only

- 7 -

time S.J. asked him to stop touching her was the last time he saw her. They were "kidding around," he explained, and he reached over and "hit her on the leg." She said she wished he "wouldn't do that anymore," and he said, "Okay. No problem."

West's daughter, Donna West Knight, testified that West and S.J. had a close, affectionate, grandfather-granddaughter-type relationship. Knight stated that S.J. called West "grandpa" and would frequently "call up and just talk to [West] about what was going on in her life or even ask if . . . she could come over and talk to him" and his wife or go out to lunch with them. According to Knight, S.J. was "a very affectionate girl" who "liked to hug" West. Knight observed that S.J. initiated the hugs and never "seemed to feel uncomfortable around" West, even in the weeks immediately preceding the local department's receipt of the sexual abuse complaint against West.

On June 2, 2003, the administrative hearing officer issued an extensive written decision concluding, *inter alia*, that the local department's procedural violations were not fatal to the founded disposition and the evidence supported the founded disposition of sexual abuse, but did not establish that S.J. suffered "serious harm" as a result of the abuse, as required for a level one disposition. Accordingly, the hearing officer reduced the founded disposition to sexual abuse, level two.[2] In determining that the evidence supported the founded disposition of sexual abuse, the hearing officer specifically found that, given the many similarities between S.J.'s statement and West's statement, it was "more likely than not that [S.J. was] telling the truth about what happened in [West's] car" and that, "[w]hen West touched S.J.'s genital area, breasts and buttocks, he did so intentionally and with the intent of providing himself sexual gratification."

---

[2] The consequences of a level two finding are less severe than a level one finding, in that, among other things, a level two finding requires that the abuser's name be retained by the central registry for seven years, whereas a level one finding requires retention for eighteen years. See 22 VAC 40-700-30.

The hearing officer also noted that, although West did not appear physically capable of lifting S.J. "into the air by her buttocks," S.J. "described other touching and pinching of her buttocks, which . . . fits the policy description of 'Sexual Molestation.'"

West appealed the hearing officer's decision to the circuit court. As before, he sought reversal of the founded disposition on the grounds that the evidence failed to support a finding of sexual abuse and the local department's procedural violations rendered the founded disposition invalid. West also requested reasonable attorney's fees and costs. Upon reviewing the case, the court determined that, despite revealing "disagreement over certain factual details" and "what inferences are supported by the facts," the record contained "more than ample evidence to affirm the [hearing officer's] findings of fact." The court further determined, however, that, in failing to record the interview with S.J. in deference to the police department's "blanket policy of not tape recording interviews with alleged victims," in failing to conduct a face-to-face interview with West, and in failing to advise West of his right to tape record his interview with Detective Meadows, the local department failed to "observe applicable mandates of the Virginia Administrative Code." Those collective failures to comply with required procedure, the court concluded, "could have had a significant impact on the ultimate decision to classify the allegation against . . . West as a founded complaint" and, thus, were "not mere harmless error." Observing that the local department's procedural violations were "such that new proceedings on remand [could not] cure the procedural deficiencies of the agency's investigation," the circuit court set aside the founded disposition and ordered that the complaint against West be dismissed. The court then denied West's request for attorney's fees and costs, finding them unwarranted under the circumstances of this case.

This appeal by the Commissioner and cross-appeal by West followed.

## II. PROCEDURAL ERRORS

### A. Failure to Tape Record the Alleged Victim's Interview

The Commissioner contends that Robinson, the local department's child protective services investigator in this case, properly declined to tape record the interview with S.J. because the local department and the police department conducted a joint investigation of the complaint against West, and the team leader, Detective Meadows, determined that tape recording the interview with S.J. was "inappropriate." Thus, the Commissioner argues, the exception set forth in 22 VAC 40-705-80(B)(1)(d) applies and the local department was not required to tape record the interview. Consequently, the Commissioner concludes, the circuit court erred in ruling that the local department's decision not to tape record the interview with S.J. constituted a procedural violation. We disagree.

Judicial review of a child protective services founded disposition of child abuse is governed by the Administrative Process Act (APA), codified at Code §§ 2.2-4000 to 2.2-4033. See Code § 63.2-1526(B). Accordingly, "the burden is upon the appealing party to demonstrate error." Carter v. Gordon, 28 Va. App. 133, 141, 502 S.E.2d 697, 700-01 (1998); Code § 2.2-4027. The reviewing court will view "the facts in the light most favorable to sustaining the [agency's] action," Atkinson v. Virginia Alcohol Beverage Control Comm'n, 1 Va. App. 172, 176, 336 S.E.2d 527, 530 (1985), and "take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted," Code § 2.2-4027. Moreover, the review of an agency's factual findings "is limited to determining whether substantial evidence in the agency record supports its decision," Avante at Lynchburg, Inc. v. Teefey, 28 Va. App. 156, 160, 502 S.E.2d 708, 710 (1998), and "great deference is to be accorded the agency decision," Holtzman Oil v. Commonwealth, 32 Va. App. 532, 539, 529 S.E.2d 333, 337 (2000). However, "'[i]f the issue falls outside the area generally entrusted to the

agency, and is one in which the courts have a special competence, . . . there is little reason for the judiciary to defer to an administrative interpretation.'" Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 243-44, 369 S.E.2d 1, 8 (1988) (quoting Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-15 (3d Cir. 1981)). Hence, where, as here, "the legal issues require a determination by the reviewing court whether an agency has . . . failed to observe required procedures, less deference is required and the reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination." Id. at 243, 369 S.E.2d at 7-8.

DSS's regulation 22 VAC 40-705-80(B)(1) provides, in pertinent part, as follows:

The child protective services worker shall conduct a face-to-face interview with and observation of the alleged victim child. All interviews with alleged victim children must be audio tape recorded except when the child protective services worker determines that:

a. The child's safety may be endangered by audio taping;

b. The age and/or developmental capacity of the child makes audio taping impractical;

c. A child refuses to participate in the interview if audio taping occurs; or

d. In the context of a team investigation with law-enforcement personnel, the team or team leader determines that audio taping is not appropriate.

. . . A child protective services worker shall document in detail in the record and discuss with supervisory personnel the basis for a decision not to audio tape record an interview with the alleged victim child.

As the circuit court pointed out in its ruling, the Commissioner, in arguing that Robinson was excused under 22 VAC 40-705-80(B)(1)(d) from having to tape record the interview with S.J., disregards the express mandate of the regulation that the child protective services worker must "document *in detail* in the record and discuss with supervisory personnel the basis for a decision not to audio tape record an interview with the alleged victim child." 22 VAC

- 11 -

40-705-80(B)(1) (emphasis added). That mandate makes it clear that not only must the child protective services investigator determine in each instance whether extenuating circumstances exist that make the recording of the interview impractical or inappropriate under the standards of 22 VAC 40-705-80(B)(1), the investigator must also, in each instance where the interview is not recorded, reference and articulate specific evidence and findings based on that evidence that support the conclusion that tape recording the alleged victim's interview was impractical or inappropriate. It is not enough, therefore, in deciding not to tape record the alleged victim's interview under 22 VAC 40-705-80(B)(1), to merely state in conclusory fashion, or rely on a team or team leader's conclusory statement, that recording the interview is impractical or inappropriate. There must be evidence specifically relating to the alleged victim that supports the determination that recording the interview is impractical or inappropriate. If no such evidence exists, the decision not to tape record the interview is invalid and the failure to record the interview is a violation of required procedure. See Johnston-Willis, Ltd., 6 Va. App. at 244, 369 S.E.2d at 8 (holding that "'"judicial interference is permissible . . . for relief against the arbitrary or capricious action that constitutes a clear abuse of the [administrative agency's] delegated discretion"'" (quoting Va. Alcoholic Beverage Control Comm'n v. York Street Inn, Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979) (quoting Schmidt v. Bd. of Adjustment of the City of Newark, 88 A.2d 607, 616 (N.J. 1952)))).

In this case, the reason given in the local department's investigative record for not taping the interview with S.J. is that the team leader deemed it "inappropriate." No basis for that characterization is provided in the investigative record, however. Robinson testified at the evidentiary hearing that, prior to the interview with S.J., no discussion was held with either Detective Meadows, the team leader of the joint investigation, or her supervisory personnel about whether the interview should be tape recorded. Robinson explained that she did not tape record the interview with S.J. solely because the police department was always the team leader in

- 12 -

joint investigations with the police and, since "[t]he police do not tape [victim] interviews," she did not tape the interview. No other reason for not taping the interview was offered, and none is evident in the record.

It is clear, therefore, that Robinson's interview with S.J. was not tape recorded simply because it was the local department's policy to automatically defer in joint investigations with the police to the police department's blanket policy of not recording interviews with complaining witnesses. We agree with the circuit court that the local department's blind adherence in this case to the police department's blanket policy of never recording such interviews does not, by itself, support the conclusion that tape recording the interview with S.J. was inappropriate under 22 VAC 40-705-80(B)(1)(d). Because there was no specific determination made that tape recording the interview with S.J. was either impractical or inappropriate under 22 VAC 40-705-80(B)(1), and because Robinson knew of no evidence specifically related to S.J. indicating that tape recording the interview was either impractical or inappropriate and the record reveals no such evidence, we conclude, as a matter of law, that the local department's decision not to tape record the interview is invalid.

Accordingly, we agree with the circuit court that the local department's failure to tape record the interview with S.J. constituted a violation of the regulatory procedure required by 22 VAC 40-705-80(B)(1).

### B. Harmless Error Claim

As discussed above, the local department failed to tape record Robinson's interview with S.J., in violation of 22 VAC 40-705-80(B)(1). Additionally, the Commissioner does not challenge, on appeal, the circuit court's determination that the local department failed to conduct a face-to-face interview with West, in violation of 22 VAC 40-705-80(B)(2), and failed to advise, or have Detective Meadows advise, West of his right to tape record his interview with

- 13 -

Meadows, in violation of 22 VAC 40-705-80(B)(2)(a). Instead, the Commissioner contends, in reliance on a reversible-error standard applied by this Court in Johnston-Willis, Ltd., 6 Va. App. at 258, 369 S.E.2d at 16, that all of these procedural violations by the local department were mere harmless error because West did not demonstrate that he was prejudiced by the violations or that "a contrary result would have been reached" had the violations not occurred. Thus, the Commissioner concludes, the circuit court erred in ruling that the local department's failure to observe required procedure was not mere harmless error and in setting aside the hearing officer's founded disposition of sexual abuse against West on that basis. We disagree.

In an appellate review of a hearing officer's decision, the burden is on the "party complaining of agency action to designate and demonstrate an error of law subject to review by the court. Such issues of law include: . . . observance of required procedure where any failure therein is not mere harmless error." Code § 2.2-4027. Accordingly, a party seeking relief from a founded disposition of abuse on grounds that the local department failed to comply with required procedure "must demonstrate such failure was not mere harmless error." J.B. v. Brunty, 21 Va. App. 300, 305, 464 S.E.2d 166, 169 (1995). If the party seeking relief satisfies that burden, the reviewing court "shall suspend or set [the case decision] aside." Code § 2.2-4029.

Although what constitutes "mere harmless error" under the Administrative Process Act is not amenable to precise definition and inevitably requires a case-by-case analysis, see, e.g., Ford Motor Co. v. Courtesy Motors, Inc., 237 Va. 187, 190-91, 375 S.E.2d 362, 364 (1989) (applying three different analyses in concluding that the agency's failure to comply with required procedure constituted mere harmless error), it is clear that procedural violations that "could have had a significant impact on the ultimate decision so as to undermine the 'substantiality of the evidential

support' for the factual findings" are not mere harmless error, <u>Virginia Board of Medicine v. Fetta</u>, 244 Va. 276, 283, 421 S.E.2d 410, 414 (1992).[3] Such is the case here.

Guidelines promulgated to help "the local departments of social services throughout the Commonwealth in interpreting the definitions of abuse and neglect provided by statute" are contained in DSS's Child Protective Services Policy Manual, <u>see</u> <u>Jackson v. W.</u>, 14 Va. App. 391, 399, 419 S.E.2d 385, 389 (1992), as well as in the Virginia Administrative Code, <u>see</u> 22 VAC 40-705-30. The Administrative Code defines "sexual abuse" as "any act of sexual exploitation or any sexual act upon a child in violation of the law which is committed or allowed to be committed by the child's parents or other persons responsible for the care of the child pursuant to [Code] § 63.2-100." 22 VAC 40-705-30(E). The hearing officer noted that, according to Volume VII, Section 3, Chapter A of DSS's Child Protective Services Policy Manual, the definition of "sexual abuse" encompasses "sexual molestation," which is "'an act committed with the intent to sexually molest, arouse or gratify any person, including where . . . [t]he caretaker intentionally touches the child's intimate parts or clothing directly covering such intimate parts,'" which include the "'genitalia, anus, groin, breast, or buttocks of any person.'" <u>See also</u> Code § 18.2-67.10 (providing a similar definition of "sexual abuse").

---

[3] In adopting this standard for use in this case to determine whether, or not, the local department's procedural violations were "mere harmless error," we specifically reject as inapplicable that portion of the harmless-error standard urged on us by the Commissioner that would require West to prove that "a contrary result would have been reached" absent the procedural violations. <u>Johnston-Willis, Ltd.</u>, 6 Va. App. at 258, 369 S.E.2d at 16. As indicated in <u>Johnston-Willis, Ltd.</u>, the application of that standard is limited to those circumstances where the administrative hearing officer has improperly "considered evidence not in the record": "'No reversible error will be found . . . unless there is a clear showing of prejudice arising from the admission of *such evidence*, or unless it is plain that the agency's conclusions were determined by *the improper evidence*, and that a contrary result would have been reached in *its* absence.'" <u>Id.</u> (quoting <u>Va. Real Estate Comm'n v. Bias</u>, 226 Va. 264, 270, 308 S.E.2d 123, 126 (1983)) (emphasis added). None of the procedural errors at issue in this case involved the consideration of extra-record evidence.

The gravamen of the sexual abuse complaint against West was that, when West reached over to touch S.J. in the passenger seat of the car, his hand sometimes "brush[ed]" her genitals over her clothes and the upper part of her breasts and that West touched her buttocks over her clothes while hugging her on three occasions. West admitted at the evidentiary hearing that, in the context of the close relationship he had with the child, he had touched S.J.'s leg near the knee and her face while driving and that he had hugged her, but he denied that he had ever touched her inappropriately. He insisted that the touching was strictly playful and friendly and that he never had "any sexual feelings or intents with regard to [S.J.]." He further argued that, if he did touch S.J.'s intimate parts or the clothing over her intimate parts, it was purely incidental and inadvertent. He also argued that the child protective services investigator took out of context and gave an unintended sexual bent to several remarks he made to S.J. that, given the grandfather-granddaughter-type relationship he had with her, were entirely innocent. Thus, West asserted, the local department's indirect evidence regarding S.J.'s and his interview statements did not show that he touched S.J. with the requisite intent. Considering the totality of the circumstances, the hearing officer found that West "intentionally" touched S.J.'s breasts and the clothing directly covering S.J.'s genital area and buttocks, and did so "with the intent of providing himself sexual gratification."

While it is clear that, as the circuit court determined, the evidence in the record, when viewed in the light most favorable to sustaining the agency's action, is sufficient to support the hearing officer's decision, it is equally clear that, at the time the hearing officer made that decision, "the factual issues were very much in dispute," particularly with regard to the nature of West's touching and his intent relative to that touching. Fetta, 244 Va. at 283, 421 S.E.2d at 414. The question before us, then, is whether any of the procedural violations committed by the local department during its investigation of the sexual abuse complaint against West "could have had a

- 16 -

significant impact on the ultimate decision so as to undermine the 'substantiality of the evidential support' for the factual findings." Id. Upon reviewing the record, we conclude that, under the circumstances of this case, the local department's failure to tape record S.J.'s interview very well could have.

The absence of a tape recording of S.J.'s interview is particularly critical in this case because, given the close, grandfather-granddaughter-type relationship West and S.J. had, the meaning and import of S.J.'s statements about West touching her genitals, breasts, and buttocks were susceptible to more than one plausible interpretation and necessarily turned on the subtle nuances of those statements and the conduct they described. Indeed, slight nuances in the inflection or context of the words spoken by S.J. could substantially change the meaning of statements that directly impacted the question of whether West had the requisite intent. West could not depose S.J. or call her as a witness at the administrative hearing, see Code § 63.2-1526(B), and yet the evidence regarding S.J.'s statements provided the basis for the hearing officer's finding of sexual abuse. It was essential, therefore, for the hearing officer to have access to the precise substance of S.J.'s statements.

Nevertheless, the only evidence the hearing officer had before her regarding what S.J. was asked during the interview, what she said, and how she said it was limited to the child protective services investigator's indirect evidence, based on her recall and interpretation, of what was said at the interview. Because there was no opportunity to listen to the questions posed to S.J., the manner in which the child responded, or, indeed, the responses themselves, the hearing officer was left to rely on the inferences drawn by Robinson and her interpretive conclusion that West's touching was intentional and for the purpose of sexual gratification. However, unlike Robinson's written account of the interview in the investigative record and her mostly verbatim testimony from that account, an audiotape of S.J.'s interview would have revealed the actual language used by S.J.,

as well as the tone, pauses, certainties, and other nuances of the child's statements. The ability to hear the actual interview could well have led the hearing officer to draw different inferences from S.J.'s statements and to conclude that it was at least as likely as not that West did not intentionally touch S.J.'s intimate parts or material directly covering such parts with the intent to sexually molest, arouse, or gratify. Indeed, although it is clear from the evidence that S.J. was discomforted by West's touching, it is not at all clear, particularly in light of the affectionate relationship she and West had, that S.J. believed that West "brush[ed]" her intimate parts intentionally. Nor is it clear, as a matter of law, from her reported version of what occurred that any of West's touching was for a sexual purpose. Given the child's age, it is entirely possible, as West suggests, that she simply began to feel that the innocent, friendly touching she once appreciated as a child was now embarrassing and unwelcome as an adolescent.

The need for a tape recording of S.J.'s interview is further borne out in this case by the ambiguity in Robinson's accounts of S.J.'s statements regarding the frequency and timing of S.J.'s protestations to West about his touching her. In her written account, Robinson reported that S.J. said West's touching her "high up on her leg" and her telling him "to stop, that she didn't like it" were a daily occurrence. Robinson also testified at the administrative hearing that, when West's touching made S.J. uncomfortable, S.J. would tell him to stop and he would, "but then it would happen again." However, Robinson later testified on cross-examination that S.J. only "finally" told West that she did not like his touching her just before the complaint of sexual abuse was made against West. Although plainly not dispositive in and of itself, this discrepancy tended to undermine the reliability of Robinson's secondhand version of S.J.'s statements, particularly in a case like this where nuance was critical. Without a tape recording of the interview, that reliability could not be assured by the hearing officer. Cf. 22 VAC 40-705-190(H)(12) (providing that, although not "bound by the strict rules of evidence," the hearing officer may "only consider that

- 18 -

evidence, presented by either party, which is substantially credible or reliable"). Likewise, the local department's failure to tape record the interview with S.J. left West with no meaningful recourse against any possible misapprehension or misinterpretation of S.J.'s statements by Robinson.

We hold, therefore, that the local department's failure to tape record the interview with S.J. "could have had a significant impact on the ultimate decision so as to undermine the 'substantiality of the evidential support' for the factual findings." Fetta, 244 Va. at 283, 421 S.E.2d at 414. Accordingly, that violation was not mere harmless error, id., and the founded disposition of sexual abuse must be set aside, Code § 2.2-4029.[4]

## C. Lack of Remand for Further Adjudication

The Commissioner contends, that having set aside the founded disposition of sexual abuse based on the local department's failure to comply with required procedure in the investigation of the complaint against West, the circuit court was required under Code § 2.2-4029 to remand the case to the hearing officer for further adjudication and correction of that procedural failure. Thus, the Commissioner concludes, the circuit court erred in failing to remand the case to the hearing officer to allow the local department to cure its failure to comply with required procedure. We disagree.

Code § 2.2-4029 provides, in pertinent part, that, "[w]here a . . . case decision is found by the court not to be in accordance with law under [Code] § 2.2-4027, the court shall suspend or set it aside and *remand the matter to the agency for further proceedings, if any, as the court may permit or direct in accordance with law*." (Emphasis added.) As the Supreme Court observed in Fetta, the statute explicitly grants the circuit court "the discretion to specify exactly what shall be done on remand." 244 Va. at 280, 421 S.E.2d at 412. Hence, the Court further observed, "the clear statutory

---

[4] Having concluded that the local department's failure to tape record its interview with S.J. was not mere harmless error and required the setting aside of the founded disposition of sexual abuse, we need not consider the other procedural errors addressed by the circuit court.

- 19 -

language contemplates that the circuit court may order a new hearing upon remand or, as here, may order dismissal of the charges, resulting in no further hearing at all." Id.

Thus, as in Fetta, the dispositive issue now before us "simply is whether the circuit court abused its judicial discretion in refusing to order a new hearing of the same charges and in ordering the proceeding dismissed." Id. In Fetta, the Court concluded that the circuit court did not abuse its discretion because a rehearing on remand could not undo the harm done by the agency's flawed procedure to "the fact-finding process." Id. Likewise, the harm done in this case to the fact-finding process by the local department's failure to tape record the interview with the alleged child victim cannot be corrected by a rehearing on remand. The clock cannot be turned back. Obviously, the same interview with S.J. cannot now be tape recorded. Moreover, under the circumstances of this case, any interview now conducted and tape recorded on remand would plainly be tainted by the passage of time. As we previously noted, given the close, affectionate relationship that existed between West and S.J. at the time the touching at issue occurred, the dispositive factual determination whether, in touching S.J., West had the requisite intent turned less on the basic facts of the case than on the subtle evidentiary nuances of the statements given by S.J. on March 29, 2002, regarding incidents that had occurred as recently as the day before. The passage of more than three years has clearly made the recapturing of such ephemeral nuances impossible. Cf. Toussie v. United States, 397 U.S. 112, 114 (1970) (noting the usefulness of statutes of limitations in criminal cases because even "basic facts may . . . become obscured by the passage of time" and intervening factors).

Hence, we cannot say that the circuit court abused its discretion in refusing to remand the case to the hearing officer for a new hearing and in ordering the dismissal of the complaint against West.

### III.  ATTORNEY'S FEES AND COSTS

West contends, on cross-appeal, that, having ruled in his favor, the circuit court erred in failing to award him his attorney's fees and costs.  He also requests an award of attorney's fees and costs incurred in defending this appeal.

Code § 2.2-4030(A) provides, in pertinent part, that a person contesting an agency decision "shall be entitled to recover from that agency . . . reasonable costs and attorneys' fees if such person substantially prevails on the merits of the case and the agency's position is not substantially justified."  Although West prevailed in the circuit court and prevails again in this Court, we conclude that the Commissioner's position in this case was "substantially justified." As previously mentioned, there was ample evidence to support the hearing officer's decision. Moreover, the Commissioner's position that the local department's decision not to tape record its interview with the alleged child victim did not constitute a procedural violation was "substantially plausible and was based on the [local department's] long-standing practice," under 22 VAC 40-705-80(B)(1)(d), of deferring to the police department's procedural policy when conducting a joint investigation, a practice which, prior to the instant appeals, "had never been [fully] tested in court."  Motor Vehicle Dealer Bd. v. Morgan, 38 Va. App. 665, 672, 568 S.E.2d 378, 381 (2002).  Thus, although wrong, the Commissioner's position was not unreasonable.

We hold, therefore, that West is not entitled to an award of attorney's fees and costs incurred in the circuit court or in this Court, under Code § 2.2-4030(A).

### IV.  CONCLUSION

For these reasons, we affirm the circuit court's judgment in deciding that the local department's failure to tape record its interview with the alleged victim constituted a procedural violation and was not mere harmless error, in ordering the dismissal of the complaint against West rather than remanding the case to the hearing officer for further adjudication, and in

- 21 -

denying West's request for attorney's fees and costs.  Accordingly, we remand this case to the circuit court for remand to the Commissioner with instructions to dismiss the complaint of sexual abuse against West.

<u>Affirmed.</u>

McClanahan, J., concurring, in part, and dissenting, in part.

I concur with the majority with regard to its decision in Parts II A and III. I dissent with regard to Part II B, because I believe substantial evidence supports the agency's decision and West did not prove that the procedural violations were not mere harmless error. Thus, I need not address Part II C.

The Administrative Process Act, Code § 2.2-4000 *et seq.*, provides that "the duty of the court with respect to issues of fact shall be limited to ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of the facts could reasonably find them to be as it did." Code § 2.2-4027; see Vasaio v. DMV, 42 Va. App. 190, 196, 590 S.E.2d 596, 599 (2004); J.P. v. Carter, 24 Va. App. 707, 720 n.5, 485 S.E.2d 162, 169 n.5 (1997). As such, "the circuit court's role in an appeal from an agency decision is equivalent to an appellate court's role in an appeal from a trial court." Sch. Bd. v. Nicely, 12 Va. App. 1051, 1062, 408 S.E.2d 545, 551 (1991). We have authority to "reject agency factfinding 'only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'" Citland, Ltd. v. Commonwealth, 45 Va. App. 268, 274-75, 610 S.E.2d 321, 324 (2005) (quoting Mattaponi Indian Tribe v. Commonwealth, 43 Va. App. 690, 706, 601 S.E.2d 667, 675 (2004)) (emphasis in original). "This standard is designed 'to give great stability and finality to the fact-finding process of the administrative agency.'" Atkinson v. Virginia ABC Comm'n, 1 Va. App. 172, 176, 336 S.E.2d 527, 530 (1985) (quoting Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983)).

At the administrative hearing, the evidence showed that when Detective Meadows told West that it seemed he was admitting to everything the child said, except for touching her breast area, West replied that was correct. The hearing officer found that West's and S.J.'s statements were "so similar as to be almost identical," that the evidence supported the allegations, and that

- 23 -

the procedural violations were not fatal to the disposition. The trial court repeatedly stated that it had "concluded there was 'ample' evidence on which to base the agency's findings of fact." Its initial opinion letter read:

> While the record in this case reveals disagreement over certain factual details – and, more particularly, over what inferences are supported by the facts – it cannot be characterized as lacking substantial evidential support for the agency's decision. To the contrary, the record includes more than ample evidence to affirm the agency's findings of fact. In short, the record establishes no substantive ground on which the agency's decision should be disturbed.

The court further stated that "West did not prevail on the substantive question in the case," which was whether he had engaged in the sexual abuse of S.J. The trial court found the evidence to be "substantial" and "ample." It then affirmed the agency's disposition of "Founded – Sexual Abuse (Sexual Molestation) – Level Two" against West, leaving no question about whether the evidence supported the result the agency reached.

It is also clear that the local department failed to abide by its own procedures and the provisions of the Virginia Administrative Code. I agree with the trial court and with the majority that those failures constituted procedural error. I do not agree that the procedural error results in dismissal of the case. The majority concludes that because, "[i]t was essential . . . for the hearing officer to have access to the precise substance of S.J.'s statements," the case should be dismissed for lack of tape recording. In fact, there are four exceptions to the rule requiring a tape recording. One of those exceptions, DSS regulation 22 VAC 40-705-80(B)(1)(d), permits no tape recording if, "[i]n the context of a team investigation with law-enforcement personnel, the team or team leader determines that audio taping is not appropriate" – exactly the situation in this case. If the interview is not tape recorded, the CPS worker must document the basis for the decision not to tape. Thus, the error in this case was not that there was a failure to tape record, but that the CPS worker did not document the basis for the decision not to tape.

- 24 -

The majority concludes that tape recording the child's statement was "essential," and, without it, the accused cannot get a fair hearing, because the trier of fact "cannot reliably serve its function." See Arizona v. Fulminante, 499 U.S. 279, 310 (1991) (citing Rose v. Clark, 478 U.S. 570, 577-78 (1986)). Such a ruling improperly elevates the error to the level of a structural error. "[A] structural error is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" Emmett v. Warden, 269 Va. 164, 168, 609 S.E.2d 602, 605 (2005) (quoting Fulminante, 499 U.S. at 310).

> Examples of errors which affect the framework of a trial include the denial of a public trial, the denial of counsel, the denial of an impartial trial judge[,] . . . the infringement upon a defendant's right to represent himself, and the improper instruction to a jury as to reasonable doubt and the burden of proof.

Morrisette v. Warden, ___ Va. ___, ___, 613 S.E.2d 551, 556 (2005); see also Johnson v. United States, 520 U.S. 461, 466-67 (1997). The United States Supreme Court has held that such structural errors defy harmless error analysis because they undermine the proceeding's fairness as a whole. Fulminante, 499 U.S. at 309-10.

The error in this case is not structural, and therefore, *is* subject to harmless error analysis. See generally, Johnson, 520 U.S. at 468-69. Non-structural errors are amenable to harmless error analysis because they "'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" Sanchez v. Commonwealth, 41 Va. App. 340, 352, 585 S.E.2d 337, 343 (2003) (quoting Brecht v. Abrahamson, 507 U.S. 619, 629 (1993)). Such errors do not "'infect the entire trial process.'" Id. at 352 n.4, 585 S.E.2d at 343 n.4 (citing Tuggle v. Netherland, 79 F.3d 1386, 1391 (4th Cir. 1996)). Even if you ignore the four exceptions to the tape recording requirement, the error in this case does not fit in that limited class of structural errors. The statute itself dictates that the harmless error standard applies to this specific kind of error, designates the party which has the burden of proof, and

explains how the standard is applied, giving the error the presumption of harmlessness. Code § 2.2-4027.

The trial court and the majority analyze this procedural, non-structural, error using the wrong standard. The majority improperly relies on <u>Virginia Bd. of Medicine v. Fetta</u>, 244 Va. 276, 421 S.E.2d 410 (1992), for its standard on whether such failure was harmless error. However, <u>Fetta</u> is a structural error case. Fetta attacked the impartiality of the fact finder. The Court specifically stated that the "mere harmless error" standard did not even apply in <u>Fetta</u>, because outside influence on the fact finder "could have had a significant impact on the ultimate decision so as to undermine the 'substantiality of the evidential support' for the factual findings." <u>Id.</u> at 283, 421 S.E.2d at 414.

The trial court also placed the burden of proof on the wrong party in its harmless error analysis. The court's letter opinion reflects that it placed the burden on the Commissioner and not on West. Code § 2.2-4027 states that the burden is "upon the party complaining of agency action to designate and demonstrate an error of law subject to review by the court. Such issues of law include: . . . observance of required procedure where any failure therein is not mere harmless error." Consequently, it is West's burden to prove that the agency's failure to detail its reasons for not tape recording the victim's statement was not mere harmless error.[5] West has the burden to show prejudice. "'[T]he burden of showing that prejudice has resulted' is on the party

---

[5] See <u>J.B. v. Brunty</u>, 21 Va. App. 300, 305, 464 S.E.2d 166, 169 (1995) ("Code § 9-6.14:17(iii) [recodified as Code § 2.2-4027] states the party seeking review of required agency procedure must demonstrate such failure was not mere harmless error."); <u>Comm. of Concerned Citizens for Prop. Rights v. Chesapeake Bay Local Assistance Bd.</u>, 15 Va. App. 664, 669, 426 S.E.2d 499, 502 (1993) ("[T]he Committee [the party complaining of the agency action] has the burden to demonstrate an error of law, such as the Board's failure to observe required procedure, *and* to show that such error is not harmless." (emphasis added)).

claiming injury from the erroneous rulings."[6] Nat'l Labor Relations Bd. v. Seine and Line

Fisherman's Union of San Pedro, 374 F.2d 974, 981 (9th Cir. 1967) (quoting Palmer v. Hoffman,

318 U.S. 109, 116 (1943)).

The trial court's letter opinion, however, is erroneously replete with references to the

Commissioner's failure to explain the agency's mistakes and prove its case, while it makes no

reference to West's demonstration of how he was prejudiced.[7] The court held that, "considered

as a whole," the procedural violations "*could* have had a significant impact on the ultimate

decision." (Emphasis added). The statute does not allow prejudice to be presumed. In fact, the

presumption is that the error was harmless. Code § 2.2-4027; Envtl. Def. Fund v. Virginia State

---

[6] An appellant with the burden of proving that an error was not harmless is required to show that the verdict rendered was attributable to the error. See Sullivan v. Louisiana, 508 U.S. 275, 279 (1993); United States v. Lane, 474 U.S. 438, 449 (1986) (holding that "an error . . . [that] affects substantial rights . . . requires reversal only if the [error] results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict" (internal quotation marks and citation omitted)); Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."); Clay v. Commonwealth, 262 Va. 253, 259-60, 546 S.E.2d 728, 731-32 (2001); Lavinder v. Commonwealth, 12 Va. App. 1003, 1006, 407 S.E.2d 910, 911 (1991) ("An error does not affect a verdict if a reviewing court can conclude, without usurping the [fact finder's] function, that, had the error not occurred, the verdict *would* have been the same." (emphasis added)); Code § 8.01-678; see also United States v. Olano, 507 U.S. 725, 734 (1993); Ctr. for Auto Safety v. Tiemann, 414 F. Supp. 215, 226 (D.D.C. 1976) ("[I]n claiming that agency action should be set aside for procedural irregularity . . ., it is plaintiffs' burden to show that prejudice has resulted."); Trifid Corp. v. Nat'l Imagery & Mapping Agency, 10 F. Supp. 2d 1087, 1095 (D. Mo. 1998) ("[T]he burden to show that prejudice has resulted from procedural irregularity rests on the party claiming injury from the allegedly erroneous ruling."); Yosemite Tenants Ass'n v. Clark, 582 F. Supp. 1342, 1363 (D. Cal. 1984).

[7] "[T]he record indicates without elaboration"; "this is the position taken by the Commissioner"; "The Commissioner contends"; "The Commissioner's analysis fails"; "the Commissioner's only explanation"; "the explanation for this failure"; "The Commissioner takes the position that the various failures to observe required procedure . . . constitute harmless error. The Court does not agree." See Watson Bros. Transp. Co. v. United States, 180 F. Supp. 732, 740 (D. Neb. 1960) ("[P]laintiff was afforded the fullest opportunity to submit evidence sustaining its statutory burden of proof.").

Water Control Bd., 15 Va. App. 271, 277, 422 S.E.2d 608, 611 (1992) ("It is well established that agency action is presumed valid on review, and the burden rests 'upon the party complaining' to overcome this presumption." (citing Code § 9-6.14:17, recodified as Code § 2.2-4027)); see also Commonwealth ex rel. State Water Control Bd. v. Appalachian Power Co., 9 Va. App. 254, 259, 386 S.E.2d 633, 635 (1989), aff'd en banc, 12 Va. App. 73, 402 S.E.2d 703 (1991).  West is required to demonstrate that the error had an actual prejudicial effect on the outcome.  See Lane, 474 U.S. at 449.  "If, when all is said and done, the conviction is sure that the error did not influence the [fact finder], or had but slight effect, the verdict and the judgment should stand."  Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731 (2001) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

As the trial court plainly stated in its second letter opinion (denying the motion to reconsider), even though it found the procedural violations *could* have made a difference, that does not mean that the outcome *would* have been any different.  The court wrote,

> This is not to say the agency *would* otherwise have made a different decision, and does not equate to a finding that West did not commit the alleged acts of sexual abuse.  As previously noted, the Court explicitly found that the agency had sufficient evidential support for its findings of fact.  Considering all the circumstances of the case, there was substantial justification for the agency's position.

(Emphasis in original).  It is hard to see how an explanation for why the interview was not tape recorded would have changed the hearing officer's determination, given the "substantial" and "ample" evidence in the record.  The evidence shows that the hearing officer found West's statement and the child's statement were "so similar as to be almost identical."  According to the hearing officer, "[the child]'s statement, as heard and noted by Ms. Robinson, was provided in its entirety to [West], and Ms. Robinson was subject to extensive cross-examination about it."  This provided West an opportunity to demonstrate to the fact finder that the statement was unreliable,

not in context, or show that the credibility of the child was diminished.[8] He did not even make an attempt at such. Moreover, West testified in person at the administrative hearing, which provided him a full opportunity to correct his statement or explain any misunderstandings. On appeal, West conceded that even if he had been provided an opportunity to tape record his own interview, he would not have changed his statement.

West was required to demonstrate that the hearing officer's verdict was attributable to the agency's failure to comply with the procedural requirements. He has not done so. West has not demonstrated that he was prejudiced by the local department's failure to explain why S.J.'s interview was not tape recorded, conduct a face-to-face interview with him, or to offer a tape recording of his interview with the police. He has not even alleged that a contrary result would have been reached. There is no basis for concluding that the proper remedy in this case is dismissal, especially when the hearing officer and the trial court found that there is substantial

---

[8] The majority states:

> [t]he absence of a tape recording of S.J.'s interview is particularly critical in this case because, given the close, grandfather-granddaughter-type relationship West and S.J. had, the meaning and import of S.J.'s statements about West touching her genitals, breasts, and buttocks were susceptible to more than one plausible interpretation and necessarily turned on the subtle nuances of those statements and the conduct they described.

However, such an analysis fails to consider that (a) the regulations do not require a tape recording; (b) the hearing officer is the fact finder in this proceeding (not the trial court and not this Court); and, (c) hearsay evidence is admissible in proceedings under the APA.

"The rules of evidence are considerably relaxed . . ., and the findings of administrative agencies will not be reversed solely because evidence was received which would have been inadmissible in court." Bias, 226 Va. at 270, 308 S.E.2d at 126. It is well established that "hearsay evidence is admissible" at an administrative hearing conducted in accordance with the Administrative Process Act. See Carter v. Gordon, 28 Va. App. 133, 141, 502 S.E.2d 697, 701 (1998). "If the agency relies on hearsay evidence, the court reviewing the sufficiency of that evidence on appeal may give it the same weight as any other record evidence." Id.

evidence to support the findings of fact. Accordingly, I would reverse the trial court and affirm the decision of the hearing officer.